## JOHN PARIS v. THE STATE.

*No. 639.    Decided June 26th, 1895.*

### 1. Murder—Confessions made Under Inducement by an Officer.

On a trial for murder, where the defendant objected to proof of his confessions made to the sheriff upon the ground that he had been induced to make said confessions by another officer who had advised him to confess to the sheriff—that he would help him, or that it would be better for him to do so—but, it being made to appear, that before said confessions were made to the sheriff, this latter officer properly warned him as to the consequences of making the same. Held: That the confessions were admissible against him.

### 2. Same—Confessions Before the Grand Jury.

On a trial for murder, where it appeared that defendant asked to be brought before the grand jury and proposed that that body should make an agreement to protect him against prosecution in consideration of his statements and confessions in regard to the killing, which proposition the grand jury declined for want of authority to make such agreement; and he was warned, by the foreman, as to the consequences ;of any confession he might make; after which the defendant made the statements and confessions proposed to be proved as evidence against him. Held: The confessions were admissible.

### 3. Same—Charge of the Court—Practice.

On a trial for murder, where the prosecution was permitted to introduce in evidence the confessions of defendant made to the sheriff, and also to the grand jury, which confessions, defendant had, as a witness, denied, were freely and voluntarily made, but claimed that the same were made under inducements held out, and promises made him by an officer. Held: That it was incumbent on the court, in reference to this matter, to instruct the jury to wholly disregard such confessions if they did not believe they were freely and voluntarily made; but made on compulsion or promises, on the part of the officer, and a failure to so charge is reversible error though no exception was taken and reserved to the failure of the court to so charge.

### 4. Same—Defendant as a Witness—Corroboration of.

When, on a trial for murder, where the defendant, as a witness in his own behalf, had testified that he was employed by a certain detective, who was in the service of the sheriff, to aid in fixing the killing upon P, and he accounted for all his acts and conduct and confessions in regard to said killing on account of his agreement with and employment by said detective. Held: It was error for the court to refuse to permit defendant to prove by the sheriff that he, the latter, did have said detective in his employ after the killing, as such testimony was important and tended to corroborate the testimony of defendant in this particular.

### 5. Evidence Impeaching Testimony—Charge Limiting and Restricting Same.

Where testimony, not of facts, but introduced solely for the purpose of the impeachment of a witness, has been admitted, it is the duty of the court, in the charge, to carefully guard the jury against any consideration of the same, except for the purpose for which it was admitted, and a failure to so limit and restrict it constitutes reversible error; and especially so where the charge has been excepted to on account of such failure.

### 6. Duress as a Defense—Statute Construed.

Our Statute Penal Code, Art. 43, provides that "a person forced by threats or actual violence to do an act, is not liable to punishment for the same;" and subdi-

vision 3 of said article, further provides that: "The act must be done when the person threatening is actually present." Held: A proper construction of the statute means that the person threatening shall be so near as to have the party with the means at his command under his power and control at the time he does the act.

**7.　Due Course of the Law of the Land.**

Every citizen, when placed on trial for his life, is entitled to a trial according to the due course of the law of the land, and the rules of evidence in the admission of testimony, and the application of rules of law to admitted testimony are as much a part of the law of the land as trial by jury itself.

APPEAL from the Criminal District Court of Dallas.　Tried below before the Hon. CHARLES F. CLINT.

Appellant was tried upon an indictment which charged him with the murder of qne Y. M. Langdon, in Dallas county, on the 22nd day of October, 1893, by striking him with a piece of gas pipe.　At the trial he was convicted of murder of the first degree, the penalty being assessed at death.

The statement of facts, contained in the record, is most voluminous, and such portions are only reproduced as bear upon the questions discussed in the opinion.

R. L. Cornwell, witness for the State, testified that he was a police officer in the city of Dallas, and had been since May, 1891.　He knew defendant, and knew him prior to the 20th of October, 1893.　He went to San Angelo to arrest John Paris, but found him in jail at Lampasas. On the train between Lampasas and Temple, he told the defendant that the best thing he could do was to tell Mr. Cabell, the sheriff, the truth about the matter, "and I told him it might make it easier for him.

Ben Cabell, sheriff of Dallas County, testified that he met the defendant at Temple, Texas, in charge of two officers, Cornwell and Furlong; that he had a conversation with defendant, who said, "I ought to tell all about this thing, and am going to do it."　"I told him to tell the truth, and the only promise I made him was that I would investigate what he said and let the result of the investigation be known in the court.　I warned him before he told me, that anything he might say to me would be used against him on trial, and I called on Bob Cornwell to witness what he said; and after he had finished his confession Cornwell repeated it to me.　Defendant requested me to bring him before the grand jury."

Ripley Harwood, secretary of the grand jury of Dallas County, testified that he reduced to writing the statements made by the defendant to the grand jury, and that said statements were read over to defendant, that defendant, before signing the statement, asked that some agreement be given him, and was told in reply that no agreement would be made with him by the grand jury, but that would have to be done by the County Attorney.　The foreman of the grand jury told him that anything he said could not be used for him.　We told him we could not in any way help him, nor relieve him from the prosecution against him.

W. H. Lewis, witness for the State, testified that he was foreman of the grand jury of Dallas County, that defendant made a statement to the grand jury, which was reduced to writing by the secretary and signed by

defendant.   Defendant asked if making the statement would "get him out of it," and I told him we could not make any agreement whatever. When he came before the grand jury I warned him, and told him any statement made by him would be voluntary on his part, and any statement he made might be used against him on the trial of the case should a bill be found, and that he could make his statement or retire, as he pleased.   I told him it could not be used for him.

The following statement was made to the grand jury and signed by the defendant:   "About one year ago I met this man, W. G. Parish; I blacked his shoes and cleaned his room, etc., and my mother washed for him.   One day he asked me would I help him if a man was going to kill him.   About five months ago he said a certain man had swindled him out of five thousand dollars that he put into the firm.   I want, he said, to ask you to help me get my money back.   About two months after he told me Mr. Langdon had got his money, and he wanted to get the money out of the damned son-of-a-bitch, and had nobody to help him out of it but me.   I said, 'Nobody would help me get out of the trouble,' and he said, 'You won't be in any danger; I will have a man arrested for it at Leggett.'   I got the first pistol from a house where he roomed.   Mr. Parish gave me the pistol at Oak Cliff, and I gave it to a boy that worked for Mr. Lett, who worked at Oak Cliff.   It was during last summer.   He, Mr. Parish, gave me another pistol not long before October 24th, as he said it had to be done before that.   I soaked it at Goldstein's for fifty cents.   The first piece of gas pipe I got from a house that burned where Scruggs' storage house was.   The next piece, he gave me the money, thirty-five cents, to buy.   He told me to get it about two and a half feet long, and met me at 7:30 at Masten and San Jacinto streets.   I did so.   Never saw the pipe any more until the night I killed the man. I drove him out between times.   He sent me notes by a boot-black at the bank, a light, brown-skin boy; used Mr. Bartlett's horse.   Mr. Bartlett lives on Patterson avenue.   The gas pipe was bought Thursday or Friday before the killing on Sunday.   He told me to come over to his house on Sunday night.   I met him at the dark patch of woods on the branch at Masten street, at 7:30 or 8 o'clock.   He proposed we should take a walk.   He had his umbrella and overcoat.   We walked up Ross and San Jacinto streets, thence to Germania, and on Bryan street to the convent.   On October 14th, a man just beyond Mr. Loomis' offered me a job; and Mr. Parish said I could not take that job and work for $7 per week and pay him for what he had done for me and pay my board out of it.   I told him I thought I could, for I said, 'You have not done no million dollars worth for me.'   He tapped me on the shoulder at the corner of the convent and said, 'Here, young man, I am here for business to-night,' then he opened the umbrella and gave me the piece of gas pipe, and said, 'That man either dies to-night or you die, you damned son of a bitch. You have been frauding me out of money long enough,' and he drew out a pistol.   I proposed to go by myself, but he said he would go with me. I said no, somebody might know him; then he changed his hats; he said

nobody ever saw him with that hat on; when he changed hats he said, 'He's bound to be on this car,' and walked back. I struck the man and reached down to pick up the pipe; didn't pick it up, and then ran. I caught up with Parish near the convent fence, by Mr. Gibbs'; he caught me by the shoulder and said, 'Did you strike him?' I told him, 'Yes.' He said, 'If you have not done a good job you will have to do it over again.' After we walked a little piece I told him we had better separate, as somebody would see us; somebody saw me hit him and might catch us. Mr. Parish changed hats about the middle of the north side of the convent fence. I ran back to Ross avenue, and Mr. Parish ran down Bryan street. I ran back to Haskell and Ross. I did not meet him any more for three or four days, when he gave me $100; another time $50. About 5 o'clock Tuesday morning he gave me $20 and told me it would be advisable for me to take a trip. I told him if ever I was caught I would keep nothing hid. I left on the 7:30 Santa Fe train. He said, 'Write to me and sign your name 'Mollie' and I will sign 'Susan,' and address it to me 'W. G. Parish, Personal.'' I went to San Angelo; he wrote that everything was all right. 'Do not send any more notes by woman; I am being watched closely. You have telegraphed me twice and sent many letters. They may catch me through the telegraph office; the postoffice cannot be watched.' He said he would send me $20 for each day for five days. I telegraphed for money. He wrote me not to telegraph any more. He sent me $20 at San Angelo and told me to leave there. He sent a letter to me at Lampasas with two $50 bills in it. Will Gaines got the change for a $50 bill. I had soaked my watch for $1, bought a scarf pin, and gave Will Gaines $3 in silver to redeem my watch; bought a ring for a girl. The sheriff arrested me at a jewelry store and said they wanted me at San Angelo; was there an hour and a half or two hours before Mr. Cornwell and the detective came. Mr. Cornwell did not speak, just said 'Hello, John.' The detective says, 'You do not know my name; my name is Furlong.' He said something about pipe. I do not know what they wanted; have seen two boys from whom I bought the pipe with Mr. Ben Cabell at Temple. I bought the clothes next day or two after the killing. It was after Mr. Parish gave me the $100. When I bought the gas pipe I had on a gray coat, a one-button cutaway. Mr. Parish said, 'You hit him and take his watch and throw it in the Trinity, or anywhere, to make it appear he was robbed.' I had on a brown hat. I recognize the pieces of letter shown me as the one I got and tore up near the postoffice at Lampasas. He says, 'I send you $100; I was afraid to risk it by express. I am at home sick in bed; unless something is done I will die. Tear this up quick.' I wrote letters from San Angelo directed to 'W. G. Parish, Personal,' as he told me to do; the letter shown me was written and signed by me. I marked it personal; I never marked any 'personal' except those to Parish. Sherman Dudley has seen us together on the long bridge near the branch back of Mr. Mitchell's. Mr. Parish came down and motioned me; I told Dudley what Mr. Parish wanted, and if he did not believe

it, follow me, but do not recognize me; he did so.    John Warner saw us talking on the branch at Masten street.    I told three boys about what Mr. Parish and I were doing—Sherman Dudley, Willie Goodson and Johnnie Warner; Goodson is at Fort Worth.    Have seen Mr. Parish at his office; know Mr. Gill.    Parish asked me if I would know Mr. Langdon at night.    I said I would not.    He said, 'Meet me at 7:30, prayer meeting night.    I will wait at Linskie's corner and watch him go in.'    I did so, and he said, 'There is the man I want you to kill—will you know him?    Be sure and meet him here again.'    I did so and followed Mr. Godley; it was on Sunday over a month before I killed him.    Mr. Parish picked out other places where I met him.    I recognize this as the gas pipe with which I hit the man.    Mr. Parish had his gun in his hands. It was midway of the vacant lot on Live Oak street.    He turned back and looked at his watch and said, 'He ought to be on this car.'    I sent two telegrams from Angelo.    These were all I sent.    He said he had the hat in his trunk for several months."

[Signed]                                      "JOHN M. PARIS."

The foregoing written statement of defendant, made before the grand jury, was read on the trial by witness Ripley Harwood.

The following is the testimony of the defendant as a witness in his own behalf at the trial:   "My name is John Paris; I am 22 years old; I have lived in Dallas since 1882; I lived in Navasota before I came to Dallas; I lived there all my life until I came to Dallas; Jerry Paris is my father; I have three sisters and my mother; my mother is visiting her mother in Bryan; I last saw her in November sometime.    I was arrested in November about the 13th or 14th.    I was arrested at Lampasas by the sheriff there.    On October 22 I was at home.    I remember that I went home late Saturday evening.    I had rheumatism in my ankle.    I went home because I was feeling sick.    I remained at home until Monday about noon.    From home I went to Miss Kate Morris' on Jackson street.    I saw Miss Kate there.    From there I went to Miss Ida Fuelers, on Jackson street.    I first heard of the murder of Y. M. Langdon on Monday morning when I came up town.    I saw it in the paper at Miss Kate's.    She lives at 406 Market street.    I next heard of it on Thursday evening.    I was at home at supper, and a man came and called for me.    He said his name was James O. Fosdick.    I never saw him before that time to my recollection. I saw him again the same Thursday night.    He came to my gate and called for me.    I heard him, and went out to the front gate,   I think I answered the call myself, and I went out again to see what he wanted, and he said to me, 'This is John Paris,' and I said 'Yes, sir;' and he says, 'I have come down here to see you on particular business, and I would like to see you where we won't be interrupted—do you know of a place where we can go?'    I went and got my hat, and went with him back to east of Columbia street, where the Oak Cliff railroad goes to Oak Cliff, and we walked down until we got to the Santa Fe switch, and

we stopped, and he told me what business he wanted me for. He asked me did I know W. G. Parish. I told him yes. He then asked if I did not know a murder had taken place lately. I told him I had seen something of it in the paper. Then he said, 'Well, how long have you known Mr. Parish?' I told him what I did for him, and that I had known him in Dallas for about three years; that I had worked for him; would clean his shoes, etc., and my mother washed for him, and he said, 'I have found out you have done served round Mr. Parish a good deal, and worked for him.' I said, 'Yes, sir,' and he said what he wanted me to do was this: 'I want you to lay this killing of Mr. Langdon on Mr. Parish.' I asked him how I was to do it; I did not know anything about it. He said he was here investigating the case, and asked me what I thought about it. I told him I guess I had better see something about it before I had anything to do with it, and he told me to meet him there Friday night. He told me to wait for him on the corner of Main and Lamar streets. He would pass me and I was to follow, and I followed him over to Patterson avenue, and we went straight up Patterson avenue until we got to North Akard, and went out Akard to Ross avenue, and out Masten street to a clump of woods, and stopped there. He said, 'What do you think about it; there's money in it for you,' and said there was $5000 in it, and said, 'I will see that you get your money, and you will not be prosecuted by law,' and said he wanted me to go and make evidence in the case. He told me he was from a private detective agency in St. Louis, and told me he could get all the evidence against him he wanted. I stood there with him awhile, and he gave me $50. This was the second time I had met him. He told me to go on and have a good time, and I left him, and he said, 'If you have nothing particular to do Saturday, I would like to see you again, and see how you feel about it, and what progress you have made.' I met him again Saturday night where the Oak Cliff trains cross, and he says, 'how do you feel.' I told him I felt all right about it. He said, 'I will see that you get your money, and you will not be bothered about it. What are you doing?' I told him I was not doing anything particular. He said, 'Well, I am going to have something else for you to do.' He told me how far he had investigated the case; that this man had gone out on the car and had been knocked in the head with a piece of pipe; and told me that they might tell the boy that bought the piece of pipe, because Mr. John Bolick and one of the boys that sold the pipe was looking for the man that bought the pipe; and on Friday morning when I went down to the court house, Mr. Williams was talking to this young man, and Mr. Bolick and I went past them. That same Friday I went out to the fair and came back. On next Sunday I was to meet him; and I was at Oak Cliff with this man Battisle, and I missed the 7 o'clock train, and I borrowed money enough to hire a double-seated rig, and I came over to Dallas and got here about 7:25, and I saw him on Maple avenue and we drove out to the corner of McKinney and Maple avenue. I met him there and he gave me $100 and asked me if I would like

to go to the springs for the rheumatism.   I told him I did not care, and I could go other places.   I told him I would like to go to San Angelo; that I had a girl there, and he told me he wanted me to write here everything so as to make evidence against Mr. Parish, and I went there and telegraphed Mr. Parish—I believe it was three times.   I wrote to him twice, and he said, 'You stay in San Angelo five days, positively, and I will send you $20 every day that you are there.'   I got to San Angelo and staid there, and the last time I wrote him for money he told me to go to Lampasas and wait there for further instructions. It was all understood I should do this before I left here; it was the understanding that I was to be arrested there, and I went on to Lampasas, and Will Gaines, the train porter, asked me what I was going there for?   The next time I saw Fosdick was when I was brought back here.   I saw him in jail; he was going to be in jail under the name of Harwood or Harbold; it was 'Har' something; I have forgotten what it was.   I saw Fosdick before I left town on Tuesday morning about 5 o'clock on the corner above the Windsor Hotel, standing at Swope and Mangold's corner, and I told him I was going to leave on the Santa Fe. I had no appointment to meet after that time.   I saw him in jail.   I was arrested at Lampasas.   I saw a Dallas officer there.   When I got to Lampasas I was arrested by the sheriff and put in jail.   Everything went smooth until I got in jail at Lampasas, then I saw what I had undertaken, and did not think I could go against a man who had been a better friend to me than anybody on earth, and knowing it was not true. I did not want to go back on parties whose money I had used, and I thought that rather than be in trouble I would end it all there, and that is why I decided to do so.   I only saw one Dallas police officer and that was Mr. Bob Cornwell.   Mr. Furlong was with him.   On the train I had a conversation with Mr. Furlong.   He came up to me and says, 'John, you don't know me?' and I said 'No, sir.'   He said, 'Do you know this man with me?' and I replied, 'Yes, sir,' and he told me it was Mr. Bob Cornwell; that he lived in Dallas, and that he was a police officer, and said, 'My name is Thomas Furlong.'   Mr. Cornwell had a conversation with me and told me it was very foolish of me in trying to take my life in that way, and said, 'It is not you we are after prosecuting, but other parties,' and he told me to go on and make a statement to Mr. Cabell, that he would do his best for me.   I had two or three minutes' conversation with Mr. Furlong when Mr. Cornwell got off to send a telegram, and he said to me, 'You are taking a whole lot of chances.   Suppose you had died.   I know all about the understanding between you and the other fellow.   You will get your money and you will be protected.   This will make stronger evidence than before.' When I got to Temple I saw Mr. Cabell and two young men there.   I was sitting in the waiting room when these two young men came up.   I was with the officers.   I think Mr. Cabell asked me if I knew the two men and I told him 'yes,' and he turned to them and says, 'There is the man that bought the gas pipe

from you,' and I said to them: 'I bought the gas pipe.' The purpose of that was, that I was to own that they were the parties, that was agreed before I left Dallas that I would not deny being the person who bought the pipe, and I never denied it. I was brought to Dallas from there. I had a conversation with Mr. Cabell. Can't say exactly where it was. He asked me about the case, and asked me whether there were other parties connected with the case, and said: 'Why don't you tell about it; make a plain statement about it. It will make it very much better for you if you would tell the truth about the matter.' I could not say how long I was on the road from Lampasas to Dallas. Left Lampasas Tuesday morning and got to Dallas Tuesday night or Wednesday morning, and was placed in jail. Can not state whether it was two or three days after I was in jail that I made my statement to the grand jury. Yes, sir, I made the statement that was read in evidence. I saw Fosdick when I was in jail. I saw him before I went before the grand jury. I think the first time I saw him was down stairs, when I was lying on a cot. The next time I saw him was up stairs. I had a few words conversation with him, and he said to me: 'Go before the grand jury tomorrow, and we will be there and see you get a written agreement,' which I asked the grand jury for. I did not see him after I went before the grand jury, and have not seen him since. The first time I ever made known these facts was the second day of the trial. That is the first time I ever said anything about it. I knew the first statement I made was not the truth, and I told you then I was going to tell the truth about it. I have not seen Mr. Fosdick any more. I think I saw Mr. Furlong since I have been in jail, once. I am not certain, however. I don't know anything of him leaving here at all. Mr. Parish never spoke to me about Mr. Langdon. I swear he never spoke to me about killing anyone in his life. I saw Mr. Parish every day until the day I left, and that is the reason I did not see him that day. I read those letters which were shown me before the grand jury. It was understood I should write those letters, the letter signed 'Susan,' the 'Susan' was Mr. Fosdick. I ain't received any letter from Mr. Parish. I did not receive any from him. I know Florence. I sent her on an errand to Mr. Parish twice, each time for $1.50, and he loaned it to me. He gave it to the woman for me. That was Tuesday before I left, I think. I don't know positively the day of the week. I came up town that day. I sent Florence up there and he said: 'John, owing to where this girl is staying I would not like to have you send her to me, as people might think I was receiving notes from some woman down there.' She was living at Miss Kate Morris'. I made those figures in that memorandum book, which you have just handed me. It was all understood that I should make all those figures in there. I was to do every little thing like this to make further evidence. I was to make evidence against Mr. Parish. I don't think there are any other entries in there. Twenty dollars was the first money I got from Mr. Fosdick; then $50;

then $20; then $100, and $50 again.  I received that money from Mr.
Fosdick.  I know something about a poem.  It was written in that
book.  I got it from Mr. Fosdick.  I saw it published in the News.
It was to make further evidence against Mr. Parish."  The defendant
offered the poem in evidence as follows:

"Here I sit, a doomed prisoner,
    Looking through the iron bars,
Longing for a moment's freedom,
    Underneath the shining stars.
Once I was as free as Venus,
    Living through this world of time,
But now I am a murderous villain,
    Driven to commit a crime.

I was taken into confidence
    Of a man I thought a friend;
'Twas he who caused me all this trouble,
    And to my pleasures brought an end.
Now he's gone to meet his maker;
    I am left to bear the blame,
And be punished for a crime committed,
    Just to save his name.

But some day I hope to meet him
    Face to face, midst joys and mirth,
And then tell him how he used me
    As his slave through days on earth."

The defendant continued:  "I said something in this statement before
the grand jury about a pistol.  I had two pistols, and gave one away; I
soaked one at Goldstein's; one I kept myself; I won the last pistol play-
ing poker.  Mollie Evans?  Well, that was an agreement between me
and Mr. Fosdick.  I was with Detective Fosdick as Mollie Evans, and
I was to get my letters as Susan, on the inside.  When I addressed Mr.
Parish I always called him Mr. Parish.  Mr. Fosdick told me when I
wrote to him to address him 'personal,' which I did.  I mentioned in my
statement to the grand jury something about John Warner, Sherman
Dudley, etc.  So far as John Warner is concerned, I had but one con-
versation with him in regard to one woman.  How it came that I men-
tioned their names to the grand jury was thus:  Fosdick asked me did I
know of any boys I could trust, and I told him I frequently went with
Sherman Dudley, and I mentioned Willie Goodson and John Warner.
He told me he would talk to these boys about the matter, and they would
swear to what I would swear to, and I thought he did speak to them, is
why I mentioned it in the grand jury room.  I frequently used to drive
Mr. Parish out at night with a certain lady here in town, and I used to
deliver the buggy back to the stable on Patterson avenue.  These boys
were all boarding at 365 Elm street.  I don't think I stated I went to
see them; I am satisfied I have not said that.  Mr. Fosdick said he would
see them, after I mentioned their names and told him what kind of look-
ing boys they were.  I did not see those boys after I told Mr. Fosdick
about them.  The statement I made before the grand jury was not true.
Mr. Fosdick gave me the details of the statement I was to make before
the grand jury; they were not in writing."

The matter relating to the impeachment of the defendant's witness, Rosa Paris, by showing contradictory statements made by her before the grand jury, and the failure of the court to limit and restrict the purposes of such testimony in the charge are so fully stated in the opinion that any further statement with relation thereto is unnecessary.

*Miller & Williams*, for appellant.—1. The court erred in admitting in evidence the confession made to B. E. Cabell, sheriff, on the train between Temple and Dallas. And, also erred in admitting in evidence the confession of defendant made before the grand jury, because, these confessions were made under the hope of reward held out to defendant by the promises of Officer Cornwell, and in expectation that Officer Cornwell would do what he could for him. Thompson v. State, 19 Texas Crim. App., 593; Neely v. State, 27 Texas Crim. App., 324; Searcy v. State, 28 Texas Crim. App., 513; Grosse v. State, 11 Texas Crim. App., 364; Lauderdale v. State, 31 Texas Crim. Rep., 46; Clayton v. State, 31 Texas Crim. Rep., 489; Wills. Crim. Stats. Sec. 2472; Marsden's Crim. Dec's., eighth edition, Secs. 651–673.

2. The court erred in the failure of the charge to limit and restrict the objects and purposes of the evidence which the State was allowed to introduce, for the purpose of impeaching the testimony of Rosa Paris by proving contradictory statements made by her, when a witness before the grand jury. The charge was excepted to for omission in this particular. Sexton v. State, 33 Tex. Crim. Rep., 416; Exon v. State, 33 Tex. Crim. Rep., 461; Warren v. State, 33 Tex. Crim. Rep., 502; Shackelford v. State, 27 S. W. Rep., 8.

3. The charge of the court to the defense of duress was erroneous, in that the court told the jury that this defense would not avail unless W. G. Parish, the party whom defendant claimed was threatening him, was actually present with defendant at the time he committed the act; whereas the jury should have been instructed that if Parish was armed with a deadly weapon, and by his proximity, was in a position to kill defendant, as he had threatened, this would constitute actual presence. The charge, as given, in this particular was excepted to, and the court refused the following requested instruction which was asked by defendant with regard to duress, as applicable to the facts proved:

"It is the law of this State that a person forced by threats to do an act, is not liable to punishment for the same. Such threats, however, must be a threat to take the life or a threat to do great personal injury, by some one to the person doing the act. The threat must be such as would be calculated to intimidate a person of ordinary firmness. The act must be done when the person making the threat is actually present and in this connection the jury is instructed that if the person making the threat be not actually present but is in such proximity to the place where the act is committed as to have command and control over the person threatened, and this fact is known to said person and by reason of it, he is put in fear of his life or of great personal injury, then such prox-

imity of the person making the threat would in law be an actual presence at the time the act was done.

"Therefore you are instructed, that if you believe from the evidence in this cause, beyond a reasonable doubt, that the defendant inflicted the blow that produced the death of Y. M. Langdon, but also believe that at the time that he inflicted such blow, he was under the inflence and command of one W. G. Parish, to such an extent and nature, as was calculated to intimidate a person of ordinary firmness, and was then threatened with death or great personal injury by the said W. G. Parish and by reason of such threat the defendant was intimidated into doing the act of inflicting said blow, as a result of the influence and command the said W. G. Parish had and exercised over him (defendant) then the defendant is not in law responsible for said act and must be acquitted." Penal Code, Art. 43; Stanley v. State, 16 Tex. Crim. App., 392.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was convicted of murder in the first degree, and his punishment assessed at death, and from the judgment of the lower court he prosecutes this appeal. The theory of this case for the State is that the appellant was hired by one W. G. Parish to kill the deceased, Y. M. Langdon. The killing occurred at night, on one of the public streets in Dallas, in front of the house of the deceased, and was done with a piece of gas pipe. The evidence for the State showed said piece of gas pipe was procured by the defendant several days before the homicide, and in anticipation thereof, and that, on the night of the killing, W. G. Parish accompanied the defendant to within a short distance of the scene of the homicide, and remained in waiting while the defendant proceeded down about half a block to near the front of the house of the deceased. In a short time thereafter, an electric car came along. The deceased alighted from it, and proceeded across the street towards his home. The defendant intercepted him, struck him over the head with the piece of gas pipe, which felled him to the earth, and then fled; went back to where W. G. Parish was, and they proceeded together for a short distance, and then separated. This occurred on the night of the 22nd of October, 1893. About ten days after this the defendant was arrested in Lampasas. Aside from his confessions, the case against defendant was of a purely circumstantial character. The defenses relied on by appellant were an alibi, and that, if he killed the deceased, he was under duress, and compelled to do so by W. G. Parish; and he accounted for all of his acts and conduct, adduced by the State in connection with the homicide, and claimed by the State as inculpatory, as having been induced by one Fosdick, who, he claimed, was a detective employed by the State, and who induced him to pursue such a course of conduct in order to inculpate the said W. G. Parish in the homicide. In the view we have taken of this case, it will not be necessary to notice all of the bills of exception or assignments of error, and we will therefore only discuss such as we deem necessary.

The appellant in this case objected to the statements or confessions testified to by Sheriff Cabell, as having been made to him by the defendant on the train en route from Lampasas (the place of his arrest) to Dallas, claiming that the same were not voluntary and freely made, but that he had been induced to make same by certain statements made to him by one Cornwell, who was also an officer, to the effect that it would be best for him to make a full statement to said Cabell of all he knew about the homicide, and that he would help him, or that it would be better for him.   He also objected to the testimony of one Ripley Harwood, a member of the grand jury, as to the statements of appellant made before the grand jury in the investigation of this case, claiming that same was not freely and voluntarily made, but that same was still effected by the promises of said Cornwell, as evidenced by the fact that, before he made the said statement before the grand jury he asked them for a written agreement that he would not be prosecuted for the murder of the deceased.   The court overruled the objections of the defendant, and allowed the testimony.   We have examined the record in this case, and in this action of the court in admitting the testimony we see no error. The evidence shows that, whatever may have been the suggestions made to the defendant by Cornwell, before he made any statement to Cabell he was rewarned by that officer; and, as to the statements made by defendant before the grand jury, he asked to be brought before the grand jury of his own accord, and, while he insisted that the grand jury should make an agreement with him to protect him against prosecution, they expressly told him they had no power in the premises, and the County Attorney was the only officer who controlled that matter, and they declined to make any agreement with him, after which he made the statement contained in the record of his connection with the offense.   In this connection, however, we would observe the failure of the court to give a charge to the jury submitting the issue to them as to whether said confessions were freely and voluntarily made by the defendant, inasmuch as the defendant himself, when on the stand, denied that the confessions were freely and voluntarily made, and claimed that he was induced to make same by promises to him by Cornwell.   The court should have instructed the jury on this point, and informed them that if they did not believe that said confessions were freely and voluntarily made by the defendant, but were made on compulsion or promises on the part of the officer, they should wholly disregard the same, and this notwithstanding no exception was taken to the failure of the court to so charge.   Appellant complains that he was not allowed to prove by the State's witness, Ben Cabell, when he was on the stand, that he had a man in his employ as detective, assisting in rounding up the slayer of Y. M. Langdon, whose real name was Harbold, but who went under the name of Fosdick and other names.   Defendant proposed to prove that said Cabell had in his employ such a man, and that he was the same man who induced defendant to make the confession which is a part of this record.   In view of the fact that appel-

lant, in his testimony, stated that he was employed by this man Fosdick, after the killing of Langdon, to aid in laying the homicide to W. G. Parish, and that he accounted for all of his acts and conduct and for his confession on account of his said agreement with Fosdick, and that this testimony was in rebuttal of the State's case against appellant, and that defendant alone, of all the witnesses, testified as to any knowledge of this man Fosdick, rendered the testimony proposed to be adduced from the sheriff material, as corroborative of defendant's testimony, showing by said sheriff that there was such a man engaged in detective work in ferreting out said case. The defendant's testimony stood alone as to the identity of this man, and, if he could have re-enforced his evidence by the testimony of the sheriff that there was such a man at Dallas at the time engaged in detective work in said case, it seems to us that it would have been very important testimony on his behalf. Without such corroboration, the jury may have been disposed to doubt the reality of the person in question; but with the testimony of the sheriff on this point, who was certainly not interested on behalf of the defendant, they would no longer entertain a doubt as to the existence of such a person. But whether that testimony was worth much or little is not the question. It was legitimate testimony for the defendant, and he was entitled to the benefit thereof.

When Rosa Paris, witness for the defendant, was on the stand, the State, on cross-examination, asked her if she did not testify before the grand jury that W. G. Parish had called many times at her house, and that he had always called for John (meaning defendant, John Paris), and took John away with him. The witness denied this, whereupon the State called one Ripley Harwood, who testified that said Rosa swore before the grand jury that W. G. Parish often came to her house, and that he always called for John, and took him away with him. The court, after the admission of this testimony, wholly failed to limit same to the sole purpose of impeachment of said Rosa Paris, and as going only to affect her credibility before the jury, to all of which the defendant excepted. The basis of the State's case against the defendant was that he had entered into a conspiracy with W. G. Parish to kill the deceased, Langdon, and all legitimate testimony bearing upon this important fact was quite material in the prosecution of the case against the defendant; and, if the State could have shown the fact, pending the conspiracy, that W. G. Parish frequently came to the house of Rosa Paris, the sister of defendant, and had interviews with John, and took him away with him, it was very important. When the defendant placed this witness on the stand she was not questioned upon this branch of the case, nor anything connected with said statement. When the State took her, on cross-examination, she was asked for the first time regarding whether or not she had made such statement in the grand jury room; and, upon her denial of same, the State was permitted to prove by one of the grand jurors that she did make such statement, as before quoted; and, without some limitation in the charge as to the

purpose for which this evidence was adduced, the jury were liable to regard it as a fact proven in the case that W. G. Parish frequently came to the house of Rosa Paris, and took John away with him, preceding the homicide or immediately thereafter. And the decisions of this court appear to be predicated upon this idea. At least, they proceed upon the view that where such testimony, not of facts, but adduced for the purpose of impeachment of a witness, is produced upon the trial, it is the duty of the court to carefully guard the jury against the consideration of the same, except for the purpose for which the testimony was admitted; and we have searched through the Reports in vain for a case where this character of testimony was offered, and the court refused to properly limit same, and an exception was taken thereto, where this court has not reversed the judgment. See Williams v. State, 25 Texas Crim. App., 77; Foster v. State, 28 Texas Crim. App., 45; Rogers v. State, 26 Texas Crim. App., 404; Thompson v. State, 29 Texas Crim. App., 208; Shackelford v. State (Tex. Crim. App.), 27 S. W. Rep., 8. And a number of other cases might be cited where no exception was taken to the failure of the court to charge the jury with reference to said impeaching testimony, but such is not deemed necessary. We would further observe that the record disclosed that Rosa Paris was the State's witness as to this matter, and it is exceedingly questionable whether she could be impeached at all by the State. The appellant in this case complains that the court, in charging upon his defense of duress, improperly limited the charge to the actual presence of W. G. Parish at the scene of the homicide. The testimony in this case shows that W. G. Parish was not immediately present at the killing of Langdon; that he was from one to two hundred feet, or about a half a block, away at the time the mortal blow was given. It also shows that he was armed with a pistol. The charge, after quoting the statute in question, the third clause of which reads as follows: "The act must be done when the person threatening is actually present," instructs the jury that the said W. G. Parish must be actually present at the scene of the killing at the time it occurred, in order to create a duress which would be a good defense. The defendant, in this connection, requested the court to instruct the jury as follows: "The act must be done when the person making the threat is actually present; and in this connection the jury is instructed that if the person making the threat be not actually present, but is in such proximity to the place where the act is committed as to have command and control over the person threatened, and this fact is known to said person, and by reason of it he is put in fear of his life or of great personal injury, then such proximity of the person making the threat would in law be an actual presence at the time the act was done." This was refused. While it is true that the literal language of the article in question (Penal Code, Art. 43), requires the party duressing another to do an unlawful act to be actually present at the time, yet we apprehend that a proper construction of this section means only that the person shall be so near as to have the

party with the means at his command under his power and control at the time he does the act; and a person 20 or 30 paces from the immediate place of the killing, armed with a pistol or shotgun, might have the person doing the act as much within his power and control as if he was only a few feet distant from him when he performs the act. In one sense, W. G. Parish was actually present at the time of the killing, and the language of the court might embrace the idea of his actual presence, but yet it may have been misunderstood, and the jury might have been misled thereby, and believed that the court required them to find that he was at the immediate spot of the killing before they would allow the defense of duress. The charge asked by the defendant on this issue was pertinent, and applicable to the facts in proof; and, in our opinion, such a charge, defining what is meant by actual presence, should have been given, so as to have adequately guarded the rights of the defendant on this defense of duress set up by him. Other errors are assigned, but they are upon questions not likely to occur again on another trial of the case, and so we deem it unnecessary to discuss them. We have carefully examined the record in this case, which is voluminous, but, in view of another trial, it is not proper that we express any opinion as to the evidence. Whether the jury which tried the case would have attached any weight to the excluded testimony is not for us to say, or whether the charge of the court, if it had properly limited the admitted testimony, in the one case, and had presented the issues to the jury, in the other, would have changed the result, is not our province to inquire; but we do know that, under the law and the decisions of this State, the defendant has been deprived of testimony to which he was entitled, and the charge of the court did not adequately present the issues as to the other evidence which was admitted. Every citizen, when placed upon trial for his life, is entitled to a trial according to the due course of the law of the land; and the rules of evidence in the admission of testimony, and the application of rules of law to admitted testimony, are as much a part of the law of the land as trial by jury itself. These rules of law may be termed by some technicalities, but they accord with a fair and an impartial trial, and are founded in the wisdom of experience; and, moreover, some of these constitute the safeguards and bulwarks of human rights, and, whenever or whereever they have been disregarded or ignored, that era has marked the decadence of human freedom. For the errors of the court heretofore pointed out and discussed, the judgment of the lower court is reversed, and the cause remanded.

*Reversed and Remanded.*