EMANUEL MORRIS v. THE STATE.

No. 1519. Decided June 8, 1898.

**1.  Murder—Confession—Promise.**

On a trial for murder, a confession made by defendant when not in arrest, and where defendant prefaced it by saying, "If you won't tell, I will tell you all about it," is admissible in evidence, the party to whom it was made having made no promise that he would not tell, or otherwise, to induce him to make it.

**2.  Same—Submitting to the Jury the Issue as to Whether the Confession Was Voluntary.**

Where a proper predicate for the admission of a confession has been laid by the State and the confession introduced in evidence, and the defendant in his testimony has denied both the predicate and the making of the confession, it was proper for the court to submit the question to the jury whether or not the confession was voluntarily made; and if voluntarily made, to consider it; and if not voluntarily made, to reject it. It being a question of fact as to whether the confession was voluntary, the credibility of the witnesses and weight to be given their testimony was necessarily involved, and this was a question for the jury.

**3.  Same—Charge of Court.**

Where the court, after instructing the jury to discard the confessions of defendant if they believed they were not voluntarily made, further instructed them, "You will acquit the defendant unless you believe from the other evidence in the case that the State has established defendant's guilt beyond a reasonable doubt;" Held, the charge was not only correct, but absolutely demanded in behalf of the accused.

**4.  Improper Argument of Counsel.**

Where the district attorney, in his closing argument, denounced the defendant as "this wretch," Held, not to constitute reversible error where it is made to appear

that the court immediately warned him not to indulge in personal abuse, and told the jury to disregard and not consider such language.

**5. Same.**

The prosecuting attorney is justified in announcing his theory of defendant's motive where the same is based upon facts in evidence.

**6. Murder in the First Degree—Evidence Sufficient.**

See the opinion for facts summarized which the court hold amply sufficient to support a verdict and judgment for murder in the first degree, assessing the death penalty.

. APPEAL from the District Court of Fort Bend. Tried below before Hon. T. S. REESE.

Appeal from a conviction for murder in the first degree; penalty, death.

The opinion states all the material facts of this most atrocious murder and rape, or attempted rape, of a 6 years old blind negro girl.

*Slyfield & Davidson,* for appellant.

*John M. Pinckney, L. M. Williamson, W. W. Walling,* and *Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death, and he prosecutes this appeal.

He reserved exceptions to the action of the court in permitting the State "to prove by the witness Henry Ellis the pretended confession made to him, as shown in the statement of facts, because the same were not freely and voluntarily made, but were made under promise of concealment." Referring to the statement of facts in this connection, we find that Ellis and the defendant were together at the house where the deceased's body was found; and, immediately upon discovering the death of the child, Ellis started to the residence of Muldrow to inform him of the homicide. The defendant followed him. "Ellis kept saying, 'I wonder who did it,' and then suddenly turned to the defendant, and said to him, 'Morris, did you do that dirty trick?' Defendant said nothing but 'Um, um.' After a second or two he said, 'Well, Ellis, if you won't tell, I will tell you all about it.' Defendant then told Ellis that he had killed the child. Ellis then said, 'I will take you to the building,' and started for him." Defendant broke and ran, and succeeded in making his escape. Defendant was not under arrest; therefore no caution was necessary. It will be further seen from this statement that the witness Ellis made no promise to him of any sort. It is stated that defendant said to Ellis, "If you won't tell, I will tell you all about it," but Ellis made no promise.

Appellant excepted to the introduction of appellant's confession testified to by Dr. Rich, as well as the confession made to the witness Cassill. The objection to the evidence of these two witnesses is placed upon the same grounds, and is thus stated: "That he was not legally warned; that

they were made by coercion, and while under the influence of· terror, inspired by having been menaced by a gun, shot at with a sixshooter, hung up by the neck with a rope, and forced to tell that he committed the crime, and informed that, if he ever denied that he committed the crime, he would be killed; that the men who had ill treated him were still present when he had the conversation with Rich; and that said confession was not freely and voluntarily made." These bills are signed by the court, with this explanation: "The evidence was admitted for the reason that, in the judgment of the court, the evidence for the State showed that the grounds of objection above set out did not exist, and upon which issue the jury were properly instructed." The same objections were also urged in regard to the testimony of Stuart as to the confessions of the defendant detailed by him before the jury.

The evidence of Dr. Rich in this connection is as follows: "On the 2d of January, 1898, I was called by the justice of the peace, Mr. J. M. Cassill, to attend an inquest on the body of Fannie Williams. When I arrived at the scene of the killing, the deceased had been washed and dressed. I made an examination of the body of the deceased, and found two wounds on her head—one just above the ear and behind it; the other in the back of the head. Either wound would have killed her. I also examined the person of Fannie Williams, and found her private parts bruised and ruptured, as though punctured or attempted to be entered by some blunt instrument. I examined the bed and bedclothing, and found male semen on the bed and bedclothing in quantities. When I had completed the examination, I stated to the justice my idea of how the crime was committed. The defendant said, 'Doctor, your conclusions are correct.' Judge Cassill then stopped the defendant, and said to him: 'Emanuel, you are making testimony against yourself. Remember that any statement you may make will be used against you.' Emanuel then said: 'Doctor, you are correct. She was sitting by the fire, and I struck her one lick on the side of the head. She fell over on her face, and I struck her the second lick on the back of the head with an iron rod and killed her instantly. After I had killed her, I tried to rape her, but could not enter her. The reason I killed her was because I had heard Ophelia Williams say the day before that she wished Fannie was out of the way. I wanted to live with Ophelia, and I thought if I killed the child I would get the mother.' The defendant appears to be a negro of average intelligence. He did not appear to be at all excited or frightened at the time he made these statements; seemed cool. Have known him one and a half years. When I first got there, Woods, Blakely, and Muldrow were there."

Cassill testified that he was justice of the peace, and on the morning of January 2, 1898, after the killing the night previous, he held an inquest over the dead body of Fannie Williams, and described the wounds as did Dr. Rich. He further testified that he found semen on and just above the private parts of the dead girl, and also found some on the bed. Later in the day, after he had concluded the inquest, the defendant was pres-

ent, having been arrested early that morning by some negroes, and was then in the custody of the deputy sheriff, Stuart. In regard to the confessions of the defendant, the witness testified as follows: "The defendant kept making statements about the killing. I told him he had better hush, and that he was making testimony against himself. Finally, I cautioned him that what he said would be used as evidence against him if he made any statement about the killing. After being thus warned and cautioned, the defendant then said that he and Henry Ellis had killed the child; that they had tried to rape her; that he then struck her on the head with an iron rod, and she fell over on her face, and began crying, and then Henry Ellis struck her the second lick on the head, and killed her. When defendant made this statement he was under arrest. He was in charge of J. P. Stuart, deputy sheriff. Mr. Muldrow and Mr. Woods and others who had arrested him were in the room or about the premises. The defendant did not appear to be excited or frightened. He seemed to be cool, calm, and collected. He seemed rather to enjoy what was going on, and said he did not care about going to the penitentiary, but did want to save his neck. He repeated these statements several times. The defendant did not have any rope around his neck. Late in the evening, when Mr. Stuart started to town with the defendant, I told him he had better put a rope around his neck, as he had to go through the woods a part of the way, and defendant might get away, and he did so. I hurried the deputy sheriff off with defendant, for the reason that I was afraid he would be lynched. I saw two colored men near the house with guns, and there might have been others."

J. P. Stuart testified that he was a deputy sheriff; that Muldrow, Woods, and Blakely had the defendant a prisoner when he reached the scene of the inquest, and turned him over to said Stuart. After the inquest this witness started to Richmond, a distance of seven or eight miles, to place the defendant in jail, and before leaving the place of the inquest, Judge Cassill advised him to place a rope around the defendant's neck, and witness did so; that he had to go through the woods a part of the way, and this was to prevent the defendant's escape. In regard to the confessions of the defendant, this witness testified: "The defendant talked all the way to town. I told him not to talk, and warned him that what he said might be used against him on his trial. After this caution and warning defendant said to me, 'I am with you now, and am not afraid.' He then said that he and Henry Ellis had killed Fannie Williams; that when he went to the house she was sitting by the fire, and he hit her the first lick with a piece of iron, and Henry Ellis hit her the second lick; that he (defendant) then tried to rape her on the bed. When he got on a little further in the outskirts of the town of Richmond, defendant said to me: 'Mr. Stuart, there is no use my lying any longer. Henry Ellis had nothing to do with it. I killed the child. No one else had anything to do with it.' He said that the reason that he said Henry Ellis was in it, too, he thought that would keep them from hurting him;

that they had put a rope around his neck, and started to hang him, and he thought if he told them Henry Ellis was with him, they wouldn't hang him; but that he felt safe now, and wanted to tell the truth. This was just before we got to Richmond, and to the jail, and was all said after defendant had been repeatedly warned not to talk, and that what he said would be used against him. He said he killed the child with an iron rod he found by the fireplace, and afterwards threw it out into the bushes near the house. He said that after he killed the child, as he was going away from the house, he met Henry Ellis near the house, and went back to the house. He said that he was willing to go to the penitentiary for life, but wanted to save his neck."

We have quoted from the testimony of these three witnesses, because the appellant in his bill of exceptions refers to the statement of facts for their testimony in regard to the confession. This evidence shows that defendant was warned repeatedly that what he said might and would be used against him, and was repeatedly advised not to talk; that he was making testimony against himself. If the testimony of these witnesses is true, there was no occasion for defendant to have made the confessions under any fear of threats. The only evidence of mob violence detailed by these witnesses was the fact that two negroes were seen, armed, in the neighborhood of where the defendant was under arrest; but, if the defendant was in fear of his life, there is no evidence from these witnesses indicating that any threats were made against him, or violence used upon him, to extort any confession. On the contrary, they exclude such an idea, and show positively that he was warned and advised against making any confession at all, and urged not to talk about the transaction.

Recurring to the bill of exceptions, we find that the defendant objected to the admission of this testimony, "because the defendant was not legally warned; that they were made by coercion, and while under the influence of terror," etc. These facts are stated as grounds of objection and not matters of fact. Now, he refers in the bill to the statement of facts and the testimony of these three witnesses, and when we recur to said testimony we find that it does not support his contention. As a matter of fact, the statement of facts does show that defendant was warned; that he was not laboring under coercion, excitement, or fear; and there is not a word of testimony detailed by either of these witnesses that he had been shot at, or menaced with a gun, or hung up by the neck with a rope, and forced to tell that he had committed the crime.

The defendant took the stand himself, and contradicted the testimony of these three witnesses, and testified to facts showing that prior to making the confessions detailed by said witness he was threatened and coerced and terrified, and that consequently said confessions were not freely and voluntarily made.

Then, we have the question thus presented: A predicate properly laid by the State witnesses for the introduction of the confessions, and the confessions admitted; and a positive denial of both predicate and con-

fessions by the defendant by his own testimony. Appellant contends that, under this state of case, the confessions should have been rejected, because, he says, there was a doubt in regard to their admissibility, and that the court was in error in submitting the question to the jury whether or not such confessions were voluntarily made, and if voluntarily made they could consider them, and if not voluntarily made they should reject them. The action of the court is in accord with the authorities on this subject. See Nichols v. State, 32 Texas Crim. Rep., 391, 402; Sparks v. State, 34 Texas Crim. Rep., 86; Paris v. State, 35 Texas Crim. Rep., 82.

There being an issue on this question, sharp and decisive, as to whether or not the confessions were voluntarily made after proper caution, the court was correct in submitting such issue to the jury. In this state of case, the court would not be justified in solving this question of fact for or against either party. If the jury believed the confessions were voluntarily made, then they could consider them, and give them the weight they saw proper. If they did not believe the confessions were voluntarily made, then, of course, it was their duty to discard them. The jurors are the judges of the credibility of the witnesses and the weight to be given their testimony; and, it being a question of fact as to whether the statements were or were not voluntarily made, the credibility of the witnesses and weight to be given their testimony was necessarily involved. The court, therefore, was correct in submitting this issue to the jury.

Appellant contends that if there is a doubt as to the sufficiency of the predicate, the court must solve that doubt in favor of the defendant, and exclude the confessions. Suppose the court, after hearing the testimony upon both sides, in regard to the predicate, should not believe that for the defendant, which indicated that the confessions were extorted by threats, fear, or violence; would it be contended that this was not violative of the rights of the defendant, and, having solved the doubt adversely to the defendant, would this court be authorized to review the matter? If appellant's contention is correct, we think the revisory power of this court could not be exercised, for, the trial court in such cases having settled the doubt, that conclusion could not be revised on appeal. The absolute injury accruing to a party accused of crime, under this proposition, is too patent for discussion.

After instructing the jury in regard to this matter of confessions above discussed, the court further charged the jury: "You will acquit the defendant, unless you believe from the other evidence in the case that the State has established defendant's guilt beyond a reasonable doubt." Appellant excepted to this charge, because it was upon the weight of the evidence. We do not think so. Unless the jury believed the confessions to have been voluntarily made, the jury were instructed to discard them; and, unless there was other evidence of sufficient probative force to justify the conviction, an acquittal was directed. Now, then, if the jury should discard the confessions testified to by Cassill, by Stuart, and Rich, the other testimony could be looked to to ascertain whether the State had

made out its case; and in this state of case, unless the evidence was sufficient to justify the conviction, independent of said confessions, they were instructed to return a verdict of not guilty. This charge was not only correct, but absolutely demanded in behalf of the accused.

Appellant excepted to the following remarks made by the district attorney in his closing argument: "It was the lust of this wretch that caused the crime. After he had raped the poor blind child he murdered her in cold blood; and, if he is permitted to go free, then God help your children and the children of the country! I will tell you the motive: After he had raped the child, she told him, 'I will tell mamma;' and he told her, 'If you do, I will kill you;' and she repeated, 'I will tell mamma;' and, gentlemen of the jury, he killed her." The contention is that these remarks were calculated to inflame the minds of the jury, and warp their judgment, and that the prosecuting attorney constituted himself a witness, and detailed a conversation between the dead child and the defendant that had not been proved. The court qualified this bill by stating that when the district attorney used the expression "this wretch," the court warned him that he must not indulge in personal abuse, and the jury were told to disregard such language; that it was improper, and not to be considered by them. In regard to the remarks as to motive, there was testimony that the defendant had stated that he had killed the child, because he tried to get her to promise that she would not tell her mamma that he had tried to ravish her, and the child refused to make the promise, and for this reason he killed her. Under this state of case, the argument was justified. Counsel was simply reiterating, in his peculiar way, the testimony that had been adduced before the jury.

It is contended that the evidence is not sufficient to support the conviction. The statement of facts discloses that the deceased was a blind negro girl about six years of age; that Henry Ellis had been living in adultery with the mother of the deceased; that on the night of the homicide the mother attended a ball, requesting Henry Ellis to remain at home and take care of the blind girl until her return. To this he assented. Before the mother left home for the ball, Henry Ellis went to the residence of Ida Hill for the purpose of taking supper. On reaching Ida Hill's he found, besides Ida, the defendant and Jim Thornton. After supper the defendant, Ida Hill, Jim Thornton, and Ellis started to a store near by and on the same plantation. After going a short distance, defendant left the crowd, and did not rejoin them. The remainder of the party visited the store and remained there a short time, when Ellis took his departure for the joint residence of himself and Ophelia Williams, the mother of the deceased, Fannie Williams. As he approached their residence he met the defendant coming away. The defendant informed him of the fact that he had just been to his (Henry Ellis') house and failed to get in; that while there he saw somebody leaving said residence. At the request of Henry Ellis the defendant returned with him to the residence. Upon entering the same, a light was made, and the blind

girl was discovered to be murdered and ravished. She was struck twice on the head, her skull being crushed in two places, and her private parts were torn or ruptured. Male semen was found on her body just above her privates, and in "quantities" on the bed. Ellis left the house to give information of the homicide, and defendant followed him. Finally Ellis accused appellant of the crime. After talking a little while in regard to the matter, defendant admitted the killing, and when Ellis attempted to arrest him he fled and made his escape. He went to a farm some distance away, and stayed at the residence of one George during the night, returning to his own home the following morning, and was there arrested. The day following the homicide appellant stated that he and Ellis did the killing, and finally admitted that he had lied as to Ellis; and further stated that he himself committed the crime, and Ellis had nothing to do with it. The theory of the defense was that Ellis was the guilty party, and was endeavoring to the escape the crime himself by laying it upon the defendant, and building up a case out of the testimony against him. The testimony of the witnesses who were at Ida Hill's all show, even the defendant himself, that when he (appellant) left the crowd en route from Ida Hill's residence to the store Ellis was with them; that he did not leave them until he returned home, and when, on his return home, he met the defendant, Morris, that Morris, the defendant, returned with Ellis to his (Ellis') home, and they together entered the house, and found the child dead. So, under this state of case, even from defendant's own standpoint, Ellis is eliminated as a possible factor in the death of the child. The testimony makes it certain the girl was killed after Ellis left his residence for Ida Hill's, and before his return, and the entire time during this absence of Ellis from his home is covered by the testimony. The defendant himself even excluded any opportunity on Ellis' part to have committed the homicide. So, there is nothing in the defendant's theory that Ellis is the guilty party. Outside of the statement made by appellant, that he saw somebody leaving the house of Ellis, there is not an intimation in the record that anyone committed the deed except the defendant; and in his own testimony the defendant does not refer to this mythical party, nor does he state that he and Ellis did the killing, but denies all knowledge of the affair himself. So, we have the case narrowed down by the facts and the circumstances, to the defendant himself, independent of his confessions. We have also the defendant's confession to Ellis while he was not under arrest; we have his flight from Ellis; his flight from his own home, staying away during that night; we have his resistance and flight the next morning, when parties sought to arrest him; we have his confessions made while under arrest, after being cautioned; we have the opportunity on his part and the exclusion of the opportunity on the part of Ellis; we have his departure from the crowd with whom he was associating; his visit to the home of Ellis, where the girl was killed, at the time when she was killed. A more cold-blooded, cruel, heartless kill-

ing could hardly be imagined,—a grown man killing a six or seven year old blind girl, in connection with her ravishment, and for the purpose of preventing her telling the story of the rape. In our judgment, the case has been completely proved, and the defendant, so far as the record discloses, has had a fair and impartial trial. The judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.

[NOTE.—Appellant's motion for a rehearing was overruled without a written opinion.—Reporter.]