ACCEPTED
03-15-00316-CR
8155350
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/9/2015 11:28:26 AM
JEFFREY D. KYLE
CLERK

## No. 03-15-00316-CR

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/9/2015 11:28:26 AM
JEFFREY D. KYLE
Clerk

In The Court of Appeals
For The Third Court of Appeals District
Austin, Texas

---

**Heather Lauren Richards,**
*Appellant,*
**v.**
**The State of Texas,**
*Appellee.*

---

ON APPEAL FROM THE 207th DISTRICT COURT, COMAL
COUNTY, TEXAS TRIAL COURT CAUSE NO. CR2014-091

---

## BRIEF FOR APPELLANT REQUESTING ORAL ARGUMENT

---

Amanda Erwin
State Bar No. 24042939
109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804
Amanda@TheErwinLawFirm.com

*Counsel for Heather Lauren Richards*

## Identity of Parties and Counsel

**Appellant:**
Heather Lauren Richards

**Appellate Counsel:**
Amanda Erwin
The Erwin Law Firm, L.L.P.
109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804

**Trial Counsel:**
John Olson
20634 Creek River
San Antonio, Texas 78259
Telephone: (210) 307-0336

Wayne Huff
P.O. Box 2334
Boerne, Texas 78006
Telephone: (210) 488-4440

**Appellee:**
The State of Texas

**Appellate Counsel:**
Joshua Presley
Chief Appellate Prosecutor
Comal County Criminal District Attorney's Office
150 N. Seguin, Suite 307
New Braunfels, Texas 78130

**Trial Counsel:**
Chari Kelly and Jacqueline Doyer
Comal County Criminal District Attorney's Office
150 N. Seguin, Suite 307

New Braunfels, Texas 78130

**Trial Judge:**
Hon. Dibrell W. Waldrip

# Table of Contents

**Page**

Identity of Parties and Counsel …...….………………………..ii

Table of Contents …………….……………….iii

Index of Authorities ………………….………...iv

Statement of Case …………………………...1

Oral Argument Requested …………………………...2

Statement of Facts …………………………...2

Summary of the Argument …………………….........14

Appellant's Point of Error One ……………….………….16

Appellant's Point of Error Two ……………….………….26

Appellant's Point of Error Three ………………….……….38

Appellant's Point of Error Four ………………….……….44

Prayer ……………….………….50

Certificate of Service ……………….………….51

Certificate of Word Compliance ……………….………….52

# Index of Authorities

**Page**

**Cases**

*Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005) ………...42

*Barshaw v. Sate*, 342 S.W.3d 91 (Tex. Crim. App. 2011) …………..40

*Bell v. Cone*, 535 U.S. 685 (2000)            …………………………..28

*Butler v. State*, 716 S.W.2d 48 (Tex. Crim. App. 1986) ……………29

*Buttefield v. State,* 992 S.W.2d 448 (Tex. Crim. App. 1999) ………..20

*Coffey v. State*, 796 S.W.2d 175 (Tex. Crim. App. 1990) …………...20

*Collier v. Turpin*, 155 F.3d 1277 (11th Cir. 1998) ……..……………28

*Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004) ……………49

*Ex Parte Shorthouse*, 640 S.W.2d 924 (Tex. Crim. App. 1982) …….20

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ………………..28

*Jackson v. State*, 766 S.W.2d 504 (Tex. Crim. App. 1985) ………....29

*Kastigar v. United States*, 406 U.S.441 (1972)   …..………………..20

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) …………….40

*Kyles v. Whitley*, 514 U.S. 419 (1995)            …………………………..35

*Maness v. Meyes*, 419 U.S. 449 (1975)            …………………………..20

*Martin v. Rose*, 744 F.2d 1245 (6th Cir. 1984) ………………………28

*McCarty v. State*, 257 S.W.3 238 (Tex. Crim. App. 2008) …………39

*McMann v. Richardson*, 397 U.S. 759 (1970) ………………………26

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ………………….28

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) ……45

*Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002) …………...40

*Paris v. State*, 35 Tex.Crim. 82 (1885)   ………………………..25

*Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987) …………………...29

*Strickland v. Washington*, 466 U.S. 668 (1984) ……………………..26

*Thompson v. State*, 514 S.W.2d 275 (Tex. Crim. App. 1974) ……….22

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) …………...27

*Wall v. State*, 184 S.W.3d 730 (Tex. Crim. App. 2006) ……………..39

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) ……………...29

*Wiggins v. Smith*, 539 U.S. 510 (2003)   ………………………..27

*Wilkerson v. State*, 726 S.W.2d 542 (Tex. Crim. App. 1986) ……….26

**Statutes**

TEX. CODE CRIM. PROC. § 1.04.   …………………….16

TEX. CODE CRIM. PROC. § 2.03.   …………………….17

**Rules**

TEX. R. APP. P. 9.4   ………………………...9

TEX. R. APP. P. 9.5   ………………………...8

TEX. R. EVID. 402   …………………….44

TEX. R. EVID. 403   …………………….44

TEX R. EVID 802 …………………….39

TEX R. EVID 803 …………………….39

## Statement of the Case

This is an appeal from a criminal proceeding. On February 12, 2014, a Comal County grand jury returned an indictment charging the Appellant, Heather Lauren Richards, with one count of Attempt to Commit Capital Murder with the Underlying offense of Kidnapping, one count of Aggravated Kidnapping, one count of Aggravated Sexual Assault, one count of Aggravated Robbery, and one count of Tampering with Physical Evidence. (1 CR 15).

On May 5, 2015, after being duly selected, a jury was sworn. (6 RR 15). Ms. Richards entered a plea of not guilty to all the offenses as contained in the indictment. (6 RR 21). The jury subsequently found Ms. Richards guilty on all five counts, and further assessed punishment at fifty (50) years confinement in the Institutional Division of the Texas Department of Criminal Justice, and a zero (0) dollar fine on all five counts. (1 CR 279-293). The trial court certified Ms. Richards' right to appeal. (1 CR 234). Notice of appeal was timely filed. (1 CR 236).

## Statement of the Issues

**Point of Error One:**

Appellant was denied due process and the presumption of innocence when the trial court compelled the testimony of all three codefendants during

1

the Appellant's trial

**Point of Error Two:**

Appellant was denied the effective assistance of counsel.

**Point of Error Three:**

It was error for the trial court to admit State's Exhibit 70, inadmissible hearsay.

**Point of Error Four:**

It was error for the trial court to admit irrelevant and inflammatory photographs during the punishment phase of trial.

## Oral Argument Requested

The Appellant respectfully requests that oral argument be granted in this case.

## Statement of Facts

This is an appeal from a criminal proceeding. On February 12, 2014, a Comal County grand jury returned an indictment charging the Appellant, Heather Lauren Richards, with one count of Attempt to Commit Capital Murder with the Underlying offense of Kidnapping, one count of Aggravated Kidnapping, one count of Aggravated Sexual Assault, one count of Aggravated Robbery, and one count of Tampering with Physical Evidence. (1 CR 15).

2

On May 5, 2015, after being duly selected, a jury was sworn, (6 RR 15). Ms. Richards entered a plea of not guilty to all the offenses as contained in the indictment. (6 RR 21). The State made an opening statement, and the Defense did not. (6 RR 22-33). The State then called the alleged victim, Ms. Dana Huth. (6 RR 33).

Ms. Huth testified that she currently was residing in the Comal County Jail because she had a pending motion to revoke her felony possession of controlled substance probation out of Comal County. (6 RR 34). Ms. Huth testified that at the time of the alleged offense, she was in a sexual relationship with a Travis Nealon. (6 RR 39). Ms. Huth testified that she believed Mr. Nealon and Ms. Richards were just roommates. (6 RR 41).

On December 8th, 2013, Ms. Huth and her friend Clint went to a Big Mike's House; Big Mike was also a codefendant but passed away in the Comal County Jail awaiting trial. (6 RR 42). Trace Smith and Kayla Lardieri, codefendants of Ms. Richards, were at the home when Ms. Huth arrived. (6 RR 44). Sometime later, Ms. Richards and Sheena Hopkins, another codefendant of Ms. Richards, arrived. (6 RR 44).

At some point, Ms. Huth voluntarily went into a bedroom with all three woman codefendants. (6 RR 45). Ms. Richards confronted Ms. Huth about having a sexual relationship with her boyfriend, and Ms. Lardieri confronted

3

Ms. Huth about cloning phones. (6 RR 49-50). Ms. Richards tased Ms. Huth, and told her to take her clothes off. (6 RR 51). After Ms. Huth removed her clothing, Ms. Lardieri penetrated Ms. Huth's vagina to see if she had a wire inside of her vagina. (6 RR 52). Ms. Richards cut Ms. Huth's necklace off of Ms. Huth's neck with a pocketknife. (6 RR 53). Ms. Richards and Ms. Lardieri began stabbing Ms. Huth. (6 RR 54). Ms. Huth attempted to open the door to the bedroom, and Mr. Smith pushed her back inside of the room. (6 RR 57). Ms. Huth was then handcuffed, shackled, and gagged. (6 RR 57). At some point during the incident, Ms. Richards cut the back of Ms. Huth's neck and stated, "where is your God now?" Also, at some point during the incident, Ms. Richards and Ms. Lardieri repeatedly kicked Ms. Huth in her head. (6 RR 58). Ms. Huth was blindfolded, wrapped in a sheet, and removed from the home and left inside of a toolshed by Mr. Smith. (6 RR 60).

Ms. Huth managed to escape the toolshed, and found shelter in a neighbor's vehicle. (6 RR 62-66). Ms. Huth testified that she heard the Appellant's vehicle come back to Big Mike's home at some point during the night. (6 RR 67). In the morning, the neighbor appeared on her porch, and Ms. Huth honked the neighbor's horn to get her attention. (6 RR 69). Ms. Huth asked the neighbor to not contact the police, but to call her friend Clint

Barkley. (6 RR 69). The neighbor called law enforcement. (6 RR 69). Ms. Huth was hospitalized due to her injuries, and has scars from the altercation. (6 RR 70).

Next, the State called Mariah Daenman, the women who discovered Ms. Huth in her vehicle and contacted law enforcement. (6 RR 115-116). Ms. Daenman testified that Ms. Huth begged her to not call law enforcement. (6 RR 121).

Next, the State called William James, who testified that he was over at Big Mike's the morning after the alleged offense. (6 RR 131).

Next the State called Adrianna De Leon, a deputy at the Comal County Sheriff's Office. (6 RR 141). Deputy De Leon responded to the scene where Ms. Huth was discovered in a vehicle. (6 RR 142). Deputy De Leon took photographs of Ms. Huth's condition, and collected physical evidence. (6 RR 145-146). Over the objection of trial counsel, the Court admitted Sate's Exhibit 70, an interview of Ms. Huth at the Christus Sana Rosa Hospital, in which Ms. Huth is receiving medical treatment and is in immense pain. (6 RR 172).

Next, the State called Clint Barkley, a friend of Dana Huth, who brought Ms. Huth to Big Mike's home the night of the incident. (6 RR 185). Mr. Barkley testified that he was currently residing in the Comal County Jail

waiting to be sent to prison for the offense of aggravated assault. (6 RR 184). Mr. Barkley testified that he thought that he heard Ms. Huth call out his name when she was in the back bedroom, and also heard a lot of rumbling, and a "stun gun going off at least 12, maybe as many as 20 times." (6 RR 189). Mr. Barkley further testified that he could have gone into the bedroom, but he would have had to kill everyone in the house to gain entry. (6 RR 195). The State failed to disclose to trial counsel that Mr. Barkley had a prior impeachable conviction for murder. (1 CR 301).

Next, the State called Keith Stanislawski, a deputy with the Comal County Sheriff's Office. (6 RR 196). Deputy Stanislawski was also dispatched to the scene where Ms. Huth was discovered. (6 RR 197). Deputy Stanislawski took photographs of the scene. (6 RR 204).

Next, the State called Adrienne Pierce, a paramedic with the Canyon Lake Fire EMS. (6 RR 208). Ms. Pierce attended to Ms. Huth and helped load her into an ambulance. (6 RR 213-216).

Next, the State called Charles Motz, a detective with the Comal County Sheriff's Office. (7 RR 21). Detective Motz interviewed the alleged victim at the University Hospital, and also took photographs of her. (7 RR 22). The medical records were introduced into evidence through Detective Motz, and Detective Motz testified that the medical records indicated that the

alleged victim used amphetamines on a daily basis. (7 RR 31, 52).

Next, the State recalled William James, who testified that he viewed a video of the alleged offense. (7 RR 66). Mr. James testified that on the video, he watched Ms. Richards tackle and hold down Ms. Huth. (7 RR 68).

Next, the State called Chris Garza, a detective with the Comal County Sheriff's Office. (7 RR 70). Detective Garza interviewed the alleged victim when she was released from the hospital. (7 RR 70).

Next, the State called Ernest Ramirez, an officer with the University Hospital Police. (7 RR 73). Officer Ramirez assisted in a photo line up. (7 RR 75).

Next the State called Jerry Stoval, a friend of Ms. Lardieri, Mr. Smith, and Big Mike. (7 RR 87-88). Mr. Stoval was at Big Mike's home the night of the alleged offense, and testified that he heard "griping and yelling" coming from the bedroom that the women were in. (7 RR 90). Mr. Smith and Mrs. Lardieri were living with Mr. Stoval at the time of the incident, and they returned to Mr. Stoval's home the evening of the incident. (7 RR 92). Mr. Stoval further testified that Mr. Smith used one of his burn pits that evening. (7 RR 94).

Next, the State called Brian Morgan, a sergeant with the Comal County Sheriff's Office. (7 RR 99). Sergeant Morgan obtained a search warrant

for the residence of Mr. Chapin, or Big Mike, and conducted a search of the property. (7 RR 100-101). Sergeant Morgan took photographs and a video during his search. (7 RR 1052-105). Sergeant Morgan also collected evidence during his search. (7 RR 132). Additionally, Sergeant Morgan also conducted a search of Mr. Stoval's home, and recovered items from Mr. Stoval's burn pit (7 RR 138-139).

Sergeant Morgan further testified that Ms. Huth identified Ms. Richards in a photo lineup. (7 RR 144). Sergeant Morgan interviewed Ms. Richards, and this interview was admitted and published to the jury. (7 RR 149).

Next, the State called Sheena Hopkins, a codefendant, to testify pursuant to an order of use immunity. (8 RR 38). The State elicited that Ms. Hopkins was still awaiting trial. (8 RR 38). Ms. Hopkins testified that on the day of the incident, she went over to Mike Chapin's home with Ms. Richards, so that Ms. Richards could talk to Ms. Huth about Ms. Huth sleeping with Ms. Richards' boyfriend. (8 RR 40). Ms. Richards brought a pocketknife and a taser with her to Mike Chapin's home. (8 RR 40).

Ms. Richards, Ms. Hopkins, and Ms. Lardieri went into a bedroom in the home, as did Ms. Huth. (8 RR 42). Ms. Richards confronted Ms. Huth about sleeping with her boyfriend, and Ms. Huth admitted to such and began to talk negatively about Ms. Richards' boyfriend. (8 RR 42). Ms. Richards

8

tased Ms. Huth and took Ms. Huth's phone to see if there was any communication between Ms. Huth and Ms. Richards' boyfriend located on the phone. (8 RR 43).

Ms. Huth was asked to take her clothes off, which she did, and and Ms. Lardieri penetrated Ms. Huth's vagina with her fingers to search for a wire. (8 RR 46). Ms. Huth attempted to get up and leave the room, but Ms. Lardieri and Ms. Richards tackled Ms. Huth to the ground, and Ms. Richards held a knife to Ms. Huth's throat. (8 RR 47). Ms. Lardieri cut Ms. Huth on the back of her neck, stabbed her in one of her legs, kicked her, stomped on her, tased her several times, and spit on her. (8 RR 48).

During this, Ms. Richards was just holding Ms. Huth down. (8 RR 48). Mr. Smith came into the bedroom and instructed the women to "wrap it up," and Ms. Hopkins was instructed to get handcuffs. (8 RR 49). Ms. Huth was then handcuffed, chained up, and wrapped in a blanket. (8 RR 49). Ms. Richards, Mr. Smith, and Ms. Lardieri took Ms. Huth to a shed. (8 RR 54).

The State impeached Ms. Hopkins several times with testimony that the State made clear was from another trial proceeding. (8 RR 57-59; 91). Ms. Hopkins testified that she recorded the incident with Mike Chapin's cell phone. (8 RR 60). At some point during the encounter, Mr. Smith held a shotgun to Ms. Huth's face. (8 RR 89).

9

Next, the State called Kayla Lardieri, a codefendant, to testify pursuant to an alleged order of use immunity. (8 RR 98). Ms. Lardieri was dressed in her jail uniform, and the State elicited that she currently resided in the Comal County Jail. (8 RR 99). The evening of the alleged offense, Ms. Lardieri, Ms. Richards, Ms. Hopkins, and Ms. Huth went into a bedroom in Mike Chapin's home. (8 RR 105-106).

Ms. Richards confronted Ms. Huth about sleeping with her boyfriend, which Ms. Huth eventually admitted to. (8 RR 106). Ms. Huth then began to "talk crap" about Ms. Richards' boyfriend, and Ms. Richards punched Ms. Huth. (8 RR 106). Ms. Lardieri confronted Ms. Huth about cloning her phone, and being a "snitch." (8 RR 107). Ms. Lardieri testified that Ms. Richards tased Ms. Huth, and Ms. Richards instructed Ms. Huth to remove Ms. Huth's clothing so that they could search Ms. Huth for a wire. (8 RR 109). Ms. Lardieri testified that she did not ever penetrate Ms. Huth's vagina, and simply swiped the inside of Ms. Huth's thigh with Ms. Lardieri's hand wrapped around a t-shirt. (8 RR 110).

Ms. Richards than tased Ms. Huth again. (8 RR 112). Ms. Lardieri testified that Ms. Richards then stabbed Ms. Huth. (8 RR 113). Ms. Lardieri testified that she did stab Ms. Huth one time, and kick Ms. Huth one time, but that Ms. Richards kicked Ms. Huth more than five times and Ms.

10

Richards stabbed Ms. Huth "probably" more than ten times. (8 RR 114).

Ms. Huth tried to get away, but Ms. Richards grabbed Ms. Huth by her hair and pulled her back into the room. (8 RR 114). Ms. Richards then punched, kicked, and stabbed Ms. Huth more times. (8 RR 114). Ms. Richards then cut Ms. Huth's neck, and "it looked like she was trying to cut her head off." (8 RR 115). During the altercation, Ms. Lardieri tased Ms. Huth about ten times. (8 RR 116).

Ms. Richards stated that they might as well finish it off, and burn Ms. Huth's body in Ms. Richards' mother's fire pit, but Ms. Lardieri talked Ms. Richards out of this idea. (8 RR 117-118). Mike Chapin instructed everyone to put Ms. Huth in the shed, and Ms. Huth was handcuffed, and Ms. Richards gagged her. (8 RR 120). Ms. Huth was then wrapped in a sheet and carried out to the shed. (8 RR 121). Ms. Lardieri denied having any knowledge of Mr. Smith destroying the evidence of the incident. ( 8 RR 125-126).

On cross-examination, trial counsel questioned Ms. Lardieri about whether or not she had a conversation with Amanda Chavira regarding the alleged offense, and Ms. Lardieri denied such. (8 RR 149). At the bench, trial counsel indicated to the trial court and the State that trial counsel was going to file a motion to have certain portions of Ms. Chavira's testimony

11

admitted, however, this never occurred. (8 RR 150). The trial court recessed the case for the weekend, as trial counsel indicated that he "hadn't even gotten over to the testimony of the other –," representing to the trial court that he intended to continue cross-examination; however, on Monday, trial counsel simply passed the witness. (8 RR 156-157).

The State then called Trace Smith, a codefendant, to testify pursuant to an alleged order of use immunity. (9 RR 16-17). Before the jury was brought in, Mr. Smith was repeatedly warned by the trial court that if Mr. Smith refused to testify, that he could face contempt of court. ( 9 RR 13-15).

Mr. Smith testified in his jail uniform, and testified that he currently lived at the Comal County Jail. (9 RR 16). Mr. Smith testified that he had prior felony convictions for credit card abuse and possession of a controlled substance. (9 RR 16). Mr. Smith testified that Ms. Huth was a local drug dealer and con artist, and that he believed Ms. Huth was recording conversations of Mr. Smith dealing drugs. (9 RR 18).

Mr. Smith testified that he, Ms. Lardieri, Ms. Hopkins, and Ms. Richards used drugs in the bedroom at Mike Chapin's home the night of the alleged offense. (9 RR 25). Mr. Smith went back into the bedroom sometime later to confront Ms. Huth about the recordings, and then went

12

back to the bedroom a second time, because he was told by Mr. Chapin to "go shut her the fuck up with a shotgun." (9 RR 25). Mr. Smith then was informed that Ms. Huth was bleeding out. (9 RR 29). Mr. Chapin discussed taking Ms. Huth's body to a pig farm, and then instructed Mr. Smith to put Ms. Huth in the shed. (9 RR 29). Ms. Huth was handcuffed, put in a sheet, and taken to the shed. (9 RR 30). Mr. Smith testified that he destroyed the evidence of the altercation, and that Ms. Lardieri was aware of this fact. (9 RR 33, 54). Mr. Smith further testified that Ms. Lardieri informed him that she checked Ms. Huth's vagina for a wire the evening of the alleged offense. (9 RR 34).

Next, the State called Santiago Ortiz, a sergeant with the Comal County Sheriff's Office. (9 RR 57). The State admitted conversations recorded by the Comal County Jail between Ms. Richards and Ms. Richards' Mother. (9 RR 62).

The State rested and closed its case, as did the defense. (9 RR 82). After argument from the State and Defense, the jury subsequently found Ms. Richards guilty on all five counts. (1 CR 279-293).

During punishment, the State admitted irrelevant and prejudicial photographs of Ms. Richards' home over the objection of defense counsel. (10 RR 105). The State also published more recorded jail calls of Ms.

13

Richards. (10 RR 117).

Trial counsel alerted the trial court that he had failed to verify the application for probation that he had filed on Ms. Richards' behalf. (11 RR 5). Trial counsel called Dr. Marisa Maura as a mitigation witness. (11 RR 11). Trial counsel alerted the Court that he did not have a way to prove that Ms. Richards was probation eligible, and the trial court and the State decided that the application for probation should be admitted into evidence. (11 RR 74-82). During deliberations, the jury sent out a note requesting the sentences of the other trials, and the trial court responded, "no." (11 RR 113).

The Jury assessed punishment at fifty (50) years confinement in the Institutional Division of the Texas Department of Criminal Justice, and a zero (0) dollar fine on all five counts. (1 CR 279-293). The trial court certified Ms. Richards' right to appeal. (1 CR 234). Notice of appeal was timely filed. (1 CR 236).

## Summary of the Argument

The State and the trial court forcing all three codefendants to testify in Ms. Richards' trial denied Ms. Richards her due process and presumption of innocence. This was the equivalent of a modern day Roman Triumph, parading the codefendants, two of which had been previously found guilty,

in front of the jury. The very nature of proceedings like the one at hand, in which codefendants are forced to testify without immunity orders signed by the court, and without the benefit of counsel, simply encourages all of the participants to minimize their conduct and project it on another one of the accused. Such proceedings are inherently unreliable and are alien to the American experience and are the precise reason why the Fifth Amendment exists.

Ms. Richards was denied effective assistance of counsel, as trial counsel did not seek a continuance or funds to find an essential witness for the defense, Amanda Chavira. The only definite strategy of trial counsel that can be gleamed from the record, was to minimize Ms. Richards' conduct and attempt to paint Ms. Lardeiri as the main aggressor; and there was not a more effective way to do this than to call Ms. Chavira as a witness for the defense.

Ms. Richards was also denied effective assistance of counsel by not having any input in deciding who was to assess her punishment. It is clear that Ms. Richards was not involved in the punishment election, as the election paperwork does not contain her signature, her application for probation was not verified, and trial counsel did not have a way to prove that Ms. Richards was probation eligible.

It was error for the trial court to admit State's Exhibit Number 70, a recording of the alleged victim receiving medical treatment at a hospital. State's Exhibit Number 70 is inadmissible hearsay, as it does not fall under the excited utterance hearsay exception. Sate's Exhibit Number 70 contains unsettling screams of pain and anguish from the alleged victim as she is being treated at the hospital, and certainly had the affect of disturbing the jurors and in turn negatively impacting Ms. Richards' case.

Lastly, it was error for the trial court to admit irrelevant and highly prejudicial photographs during the punishment phase. These photographs only served to inflame the passions of the jury, and to paint Ms. Richards as an extremely violent person, a sexual deviant, and a horrible mother.

## Point of Error One

**Rule of Law**

Under the Texas Code of Criminal Procedure Article 1.04, "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CODE CRIM. PROC. § 1.04. Ms. Richards would contend that the State and the trial court compelling all three codefendants to testify in Ms. Richards' trial violated her right to due process. *Id*.

Further, under the Texas Code of Criminal Procedure, Article 2.03 (b), it is the duty of the trial court, the attorney representing the accused, the attorney representing the state and all the peace officers to so conduct themselves as to insure a fair trial for both the state and the defendant, [and] not impair the presumption of innocence. TEX. CODE CRIM. PROC. § 2.03. Ms. Richards would contend that both the trial court and the State breached this duty under Article 2.03, when they compelled all three codefendants to testify in Ms. Richards' trial.

**Analysis**

The trial court and the State compelled all three codefendants to testify in Ms. Richards' trial based on Orders Requiring Testimony and Granting Use immunity. (8 RR 38, 98); (9 RR 16-17). However, the trial court only actually signed an Order Requiring Testimony and Granting Use Immunity for one of the codefendants, Ms. Hopkins. (1 CR 210-202). The record reflects that Mr. Smith and Mr. Lardieri's Orders were never actually signed by the trial court, or ruled upon by the trial court, and therefore, Ms. Richards' contends that her due process was violated because the two codefendants testified pursuant to purported orders compelling their testimony, when in fact no such orders existed. (1 CR 174-188).

It is clear that previously sentenced codefendants, Mr. Smith and Ms.

17

Lardieri, would not have voluntarily testified without such alleged Orders in place, as demonstrated by the trial court repeatedly admonishing Mr. Smith outside the presence of the jury, that if he refused to testify he would be held in contempt. (9 RR 13-15).

The State will likely contend that the trial court's actions in admonishing Mr. Smith demonstrates that the trial court's Order Requiring Testimony and Granting Use Immunity was in effect, even though it was never actually signed or urged to be signed or ruled upon by the State. (1 CR 174-188); (9 RR 13-15). However, the Court never admonished Ms. Lardieri, and only the State made reference to the alleged Orders when introducing Ms. Lardieri to the jury. (8 RR 100). Therefore, at the very least, it was error for Ms. Lardieri's testimony to be compelled, and the State's actions violated Ms. Richards' due process rights and impaired her presumption of innocence. TEX. CODE CRIM. PROC. § 1.04; TEX. CODE CRIM. PROC. § 2.03.

Even if the Court were to hold that the trial court's failure to rule on the Applications and failure to enter an order on the Applications was not error, the State's Applications contained errors that would make the Court's reliance on just the Applications infeasible. (1 CR 181, 186). For, the Application for Ms. Lardieri, requests the trial court to "enter an Order

requiring Lardieri to appear and testify at the defendant's trial in the 207th Judicial District Court, Cause No CR 2014-090." (1 CR 181). This Application states an incorrect Cause Number, as this was the trial court cause number for Ms. Lardieri's own trial. (1 CR 307). This same error is found in the Application for Mr. Smith, asking that he be ordered to appear and testify in Ms. Lardieri's trial cause number. (1 CR 186, 307). Without a ruling or order from the trial court, these incorrect Applications should not be construed as adequate to compel testimony in Ms. Richards' trial; Ms. Richards' asserts that this error affected her due process rights and impaired her presumption of innocence. TEX. CODE CRIM. PROC. § 1.04; TEX. CODE CRIM. PROC. § 2.03.

Even if the Court were to find that there is enough in the record to support the State's likely position that it can be implied that the trial court had ordered the testimony of all three codefendants, then Ms. Richards maintains that this compulsion violated her due process rights and impaired her presumption of innocence. TEX. CODE CRIM. PROC. § 1.04; TEX. CODE CRIM. PROC. § 2.03. While Federal and Texas Courts have upheld Orders Requiring Testimony and Granting Use immunity as passing constitutional muster in regard to the person who is ordered to provide testimony, or to a person on trial when a codefendant invokes their

19

constitutional right to remain silent, Federal and Texas Courts have not analyzed the constitutional impact of Orders Requiring Testimony and Granting Use immunity on a defendant when multiple codefendants are compelled to testify in a defendant's trial, and do testify. *Maness v. Meyes*, 419 U.S. 449, 462 (1975); *Kastigar v. United States*, 406 U.S.441 (1972); *Ex Parte Shorthouse*, 640 S.W.2d 924 (Tex. Crim. App. 1982); *Coffey v. State*, 796 S.W.2d 175 (Tex. Crim. App. 1990); *Buttefield v. State,* 992 S.W.2d 448 (Tex. Crim. App. 1999).

In *Ex Parte Shorthouse*, the Texas Court of Criminal Appeals examined the issue of use immunity, and whether it violates a person's constitution right to remain silent, and held that it does not. *Ex Parte Shorthouse*, 640 S.W.2d 924 (Tex. Crim. App. 1982). However, the Court in *Ex Parte Shorthouse* examined the issue of use immunity only in the context of compelling testimony in a grand jury proceeding, and only under the context of Texas Penal Code § 71.04, which codifies Testimonial Use Immunity in the limited context of Engaging in Organized Criminal Activity. *Id*.

In *Coffey v. State*, the Texas Court of Criminal Appeals examined the issue of use immunity in the context of whether a defendant's rights were violated by the State calling a witness before the jury knowing that the

witness intended to invoke their Fifth Amendment right to remain silent not-withstanding a grant of use immunity. *Coffey v. State*, 796 S.W.2d 175 (Tex. Crim. App. 1990). The Court reasoned that there was not error, because the witness had been granted use immunity for their testimony, they did not have a valid basis to refuse to testify. *Id*. at 179.

In *Buttefield v. State*, the Texas Court of Criminal Appeals examined the issue of use immunity in the context of the State prosecuting a witness for perjury who was compelled to testify with out an order in place. *Buttefield v. State,* 992 S.W.2d 448 (Tex. Crim. App. 1999). The Court concluded that the compelled statement could be used in a perjury trial. *Id*. at 452.

In the case at hand, Ms. Richards is claiming that her due process rights and her presumption of innocence were directly impacted and affected by the State and the court compelling the testimony of her three codefendants during her trial; this issue has never been examined, and Ms. Richards implores the Honorable Court to consider such. TEX. CODE CRIM. PROC. § 1.04; TEX. CODE CRIM. PROC. § 2.03. In the case at hand, the codefendants were paraded in front of the jury in their jail uniforms, and the jury was informed that they were currently residing in the Comal County Jail. (8 RR 99); (9 RR 16). The fact that Ms. Richards' codefendants were

21

wearing clearly identifiable jail clothes gave a perception that Ms. Richards was also guilty of the offenses, undermining Ms. Richards' presumption of innocence, and violating her due process, since the State heavily relied on party and conspiracy theories to prove the State's case. (8 RR 99); (9 RR 16). Furthermore, the jury charge contained instructions regarding party and accomplice theories, therefore, leaving the jury no option but to find that Ms. Richards was just as guilty as her cohorts. (11 RR 113). For, the jury was made fully aware that the other codefendants had been found guilty of the offenses and were serving sentences for the offense when the State and the trial court forced the codefendants to testify in their jail uniforms; we know the jury was aware that other codefendants were previously convicted and sentenced for the same offenses that Ms. Richards' was on trial for, because the jury requested to know the sentences of the codefendants when they were assessing Ms. Richards' punishment. (11 RR 113). Therefore, it would be disingenuous for the State to argue that the codefendants being paraded in front of the jury in their jail clothes did not impair Ms. Richards' presumption of innocence or her due process rights. The State will likely argue that the issue of codefendants wearing jail uniforms has already been analyzed and upheld by the Texas Court of Criminal Appeals in *Thompson v. State*. *Thompson v. State,* 514 S.W.2d 275 (Tex. Crim. App. 1974).

22

However, *Thompson* can be distinguished form the case at hand, because in *Thompson*, the witnesses were determined to be safety threats by the trial court, and more importantly, the witnesses were not being compelled by the trial court to testify in that proceeding. *Id.*

Further impeding Ms. Richards' presumption of innocence and due process is the fact that codefendant Smith testified that he had prior felony convictions for credit card abuse and possession of a controlled substance; if the trial court had not forced Mr. Smith to testify, the jury would not have known this information, and in turn linked Ms. Richards with someone with felony convictions. (9 RR 16).

Moreover, Ms. Richards contends that her presumption of innocence and right to due process were negatively impacted by the trial court forcing all three codefendants to testify because it created an atmosphere conducive to untruthful and self serving testimony. TEX. CODE CRIM. PROC. § 1.04; TEX. CODE CRIM. PROC. § 2.03. A thorough reading of the record of the compelled testimony of the three defendants illustrates that the codefendants were eager to shift emphasize from their own guilty and cast blame on Ms. Richards, and were also untruthful in their testimonies. (8 RR 113-115). For example, Ms. Lardieri consistently was untruthful about perpetrating aggravated sexual assault against Ms. Huth, and repeatedly

23

denied penetrating or making contact with Ms. Huth's vagina, even though Ms. Huth testified that she was in fact penetrated by Ms. Lardieri, Ms. Hopkins testified that she witnessed Ms. Lardieri penetrated Ms. Huth's vagina, and Mr. Smith testified that Ms. Lardieri told Mr. Smith that she penetrated Ms. Huth's vagina. (6 RR 52); (8 RR 46, 110); (9 RR 34). The record reflects that Ms. Lardieri also repeatedly attempted to minimize her conduct and paint Ms. Richards as the main aggressor, and even added inflammatory testimony that no other witnesses corroborated, that Ms. Richards wanted to burn the alleged victim's body the evening of the offense. (8 RR 113-115). Additionally, Ms. Hopkins had to be impeached by the State several times with trial testimony from previous trials. (8 RR 57-59, 91).

Lastly, The Application for Order Requiring Testimony and Granting Use Immunity claims that all codefendants were "material witnesses," and that the codefendants' "testimony could not be obtained by any manner or method other than this Court ordering [them] to testify truthfully. (1 CR 174). Further, the language in the Order Granting Use Immunity for Ms. Hopkins, the only Order that was actually signed by the court, provided that Ms. Hopkins "is a material witness in the case against Heather Lauren

Richards, and the testimony sought by the State may be necessary to the public interest and so that justice may be served." (1 CR 187).

The compelled testimony of the codefendants was far from "necessary" in this case, for the record is seething with evidence for the State to prove its case against Ms. Richards without forcing the codefendants to testify; the State had the testimony of the alleged victim, her hospital records, testimony of law enforcement, testimony of witnesses that were there the evening of the incident, testimony of the neutral witnesses that discovered the alleged victim, testimony of a witness who viewed a video of the alleged offense occurring, and even a video confession from Ms. Richards, as well as jail recordings from Ms. Richards implicating her guilt. (6 RR 38, 115, 145, 185, 196); (7 RR 31, 66, 70. 75, 87, 99, 149); (9 RR 57).

As the Texas Court of Criminal Appeals articulated over a century ago in *Paris v. State*, "Every citizen, when placed upon trial for his life, is entitled to a trial according to the due course of the law of the land; and the rules of evidence in the admission of testimony, and the application of rules of law to admitted testimony, are as much a part of the law of the land as trial by jury itself. These rules of law may be termed by some technicalities, but they accord with a fair and impartial trial, and are founded in the wisdom of experience; and moreover, some of these constitute the safeguards and

bulwarks of human rights, and, whenever and wherever they have been disregarded or ignored, that era has marked the decadence of human freedom." *Paris v. State*, 35 Tex.Crim. 82, 96 (1885). Ms. Richards asserts that she suffered a grave injustice when the State and the trial court forced all three of her codefendants to testify in her trial, and therefore asks the Court to reverse the convictions below.

**Point of Error Two**

**Rule of Law**

A defendant in a criminal case is entitled to effective assistance of counsel. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). Furthermore, counsel must act within the range of competence demanded of counsel in criminal cases. *McMann v. Richardson*, 397 U.S. 759 (1970).

In *Strickland v. Washington*, the United States Supreme Court established the federal constitutional standard for determining whether counsel rendered reasonably effective assistance. *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant first must show that counsel's performance was deficient; that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id*. at 687. Second, the defendant must show that the deficient performance prejudiced the defense; that counsel's errors were so serious as

to deprive the defendant of a fair trial with a reliable result. *Id*. at 692. The defendant must identify specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id*. at 690. The reviewing court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id*. Ultimately, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Counsel's performance is measured against an "objective standard of reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). The prejudice an applicant must show is by less than a preponderance of the evidence because "[t] he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 9 (2004).

While the Appellant must overcome the "strong presumption" that counsel's challenged conduct "might be considered sound trial strategy," counsel may not insulate challenged conduct from review by claiming it was "strategic." *Bell v. Cone*, 535 U.S. 685, 698 (2000). Whether counsel's conduct was strategic is a question of fact, but whether it was objectively reasonable is a question of law, to which no deference is owed. *Collier v. Turpin*, 155 F.3d 1277, 1290 (11th Cir. 1998). As explained in *Strickland*, the issue of ineffective assistance of counsel is not a question of "basic, primary, or historical fact," and "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698. Moreover, strategic choices are entitled to deference only to the extent they are based on informed decisions. *Id.* at 690-691.

This Court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). *See also Hardwick v. Crosby*, 320 F.3d 1127, 1186 (11th Cir. 2003) ("The mere incantation of 'strategy' does not insulate attorney behavior from review."); *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir.

1984) ("even deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance"); *Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000) ("the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel"); *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987) ("This measure of deference [to a claim of trial strategy] must not be watered down into a disguised form of acquiescence."). Lastly, it is possible that a single egregious error of omission or commission by appellant's counsel constitutes ineffective assistance of counsel. *Jackson v. State*, 766 S.W.2d 504, 508 (Tex. Crim. App. 1985).

**Analysis**

First, Ms. Richards contends that her trial counsel was ineffective in not calling Ms. Amanda Chavira as a witness, or seeking a continuance to obtain Ms. Chavira's presence. *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987). Ms. Chavira was available to testify, and Ms. Chavira's testimony would have benefited Ms. Richards. *Butler v. State*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986). Trial counsel provided an affidavit addressing this issue, in which he concedes that he did not file a motion for

29

continuance when he could not get Ms. Chavira served. (1 CR 265). Appellant asserts that there was no possible strategy in failing to ask for a continuance, or ask the Court for funds to hire an investigator to find Ms. Chavira. *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987).

Trial counsel's own Motion for Production of Amanda Chavira's Present Physical Address, filed on April 30, 2015, exemplifies this point; for in trial counsel's motion, he asserts that Ms. Chavira's testimony is **absolutely essential** to the Defendant's defense. (1 CR 268-271). Trial counsel further states in his affidavit that Ms. Chavira contacted him after Ms. Richards' trial, therefore, it follows that Ms. Chavira was actually available to testify in Ms. Richards' trial, and her favorable testimony could have been obtained simply by asking for a continuance. (1 CR 265).

Trial counsel further states in his affidavit that he could not **personally** find Ms. Chavira, however, he never requested funds for an investigator to find Ms. Chavira, which Ms. Richards also claims is ineffective. (1 CR 265). On April 30, 2015, the State gave Ms. Chavira's address to trial counsel, pursuant to his motion, and on May 4, 2015 Ms. Richards' trial commenced. (1 CR 272). Appellant contends that this is simply not ample time for an attorney acting without an investigator to

locate a necessary witness, especially when he is expected to be preparing for trial on serious and complicated charges. *Id.* Further, this several day period, from when the subpoena was filed for Ms. Chavira, to the start of trial, was not enough time for an attorney to reasonably presume that an essential witness will not ever be able to be served because they have not been served in that time frame. *Id.*

Mr. Olson attempts to minimize the damage his failure to seek a continuance caused, by stating in his affidavit that "during trial, I got Sheena Hopkins to state that Kayla Lardieri cut Dana Huth's neck, and not Ms. Richards, which was part of what Ms. Chavira told an interrogating officer." (1 CR 265). However, Sheena Hopkins was a codefendant, who the State argued testified favorably for Ms. Richards in a "last effort to protect her very best friend," while Ms. Chavira was an impartial and unbiased party whose testimony would have been viewed as more credible by the jury. (10 RR 76).

A thorough reading of the record reveals that trial counsel's only well-defined trial strategy was to minimize Ms. Richards' conduct, and to paint Ms. Lardieri as the main aggressor, and Ms. Richards contends that direct testimony from Ms. Chavira would have been the most effective way to

31

employ this strategy. (1 CR 268-271). Bolstering this contention, is the fact that Ms. Chavira was a State's witness in the trial against Ms. Lardieri, precisely because Ms. Chavira's testimony was so damning against Ms. Lardieri. (1 CR 268-271). The Appellant formally requested in a Motion to Supplement the Appellate Record, that Ms. Chavira's testimony be included in Ms. Richards' record for this reason.

Ms. Chavira testified in Ms. Lardieri's trial that Ms. Lardieri admitted to Ms. Chavira that Ms. Lardieri put her fingers inside of Ms. Huth "to check to see if there was something inside of her, like a recording, and then rammed a screwdriver up her vagina." (Appellate Cause Number 03-15-00247-CR 5 RR 71). Ms. Chavira further testified that Ms. Lardieri admitted that, "she grabbed that bitch's fucking head, slammed it over here on her knee. And when she cut it open, that she was going to try to cut her fucking head off. And when it came out, it looked coagulated and so cool that she wanted to play with it." (Appellate Cause Number 03-15-00247-CR 5 RR 73). Ms. Chavira testified that Ms. Lardieri told her that she thought it was "fucking awesome" when she was tasing Ms. Huth. (Appellate Cause Number 03-15-00247-CR 5 RR 73). Ms. Chavira described Ms. Lardieri's demeanor when she was relaying all of this to Ms. Chavira as, "it was disgusting, the look in her eyes, like she was smiling, happy, like she was

32

getting off on it. She--every time she would talk about it, I mean, she was just so happy and just like a kid would talk about, you know, winning some trophy." (Appellate Cause Number 03-15-00247-CR 5 RR 74). Ms. Chavria testified that Ms. Lardieri told her that Trace came in and told them "it's time to wrap it up. But no, she said, That bitch--no, she's not done with that fucking bitch. That bitch is going to get what she deserves, something along those lines," and "at the end of the stabbing when it got really serious, it was just Kayla." (Appellate Cause Number 03-15-00247-CR 5 RR 74). Ms. Chavira testified that Ms. Lardieri relayed to her, that Ms. Lardieri "thought that bitch was fucking dead" when they put her in the shed, and that "she thought that bitch got what she deserved." (Appellate Cause Number 03-15-00247-CR 5 RR 75). Ms. Chavira lastly testified that Ms. Lardieri told her that "after the attack, they threw her in there. They went through her bloody clothes and I think her and Trace had sex…that it turned her on—not turned her on, but like all the—everything, it turned her on and made her hot and horny." (Appellate Cause Number 03-15-00247-CR 5 RR 76). Clearly, Ms. Chavira's testimony shows that Ms. Lardieri is a masochist, who was also the main aggressor in the attack against Ms. Huth, and this testimony would have allowed for trial counsel's only defined

33

strategy to be actualized. (Appellate Cause Number 03-15-00247-CR 5 RR 73-76).

Further demonstrating Ms. Richards' assertions that trial counsel was ineffective in this vein, is the fact that during the cross-examination of Ms. Lardieri, trial counsel questioned Ms. Lardieri about whether or not she had a conversation with Amanda Chavira regarding the alleged offense, and Ms. Lardieri denied such. (8 RR 149). At the bench, trial counsel indicated to the court and the State that trial counsel was going to file a motion to have certain portions of Ms. Chavira's testimony admitted; however this never occurred. (8 RR 150). Clearly, there is no possible strategy on trial counsel's part, by attempting to cross examine Ms. Lardieri regarding admissions she made to Ms. Chavira, and then never following through with any attempts to impeach to Ms. Lardieri regarding this issue. (8 RR 150). Ms. Lardieri's denial of making any statements to Ms. Chavira regarding the offense was yet another opportunity for trial counsel to request a continuance or funds for an investigator to call Ms. Chavira as an impeachment witness. (8 RR 150).

The "prejudice" prong of *Strickland* requires this Court to determine whether counsel's objectively deficient conduct highlighted above was

sufficient to undermine its confidence in the verdict, that is, whether there is a reasonable probability that, but for this objectively deficient conduct, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Kyles v. Whitley*, 514 U.S. 419, 430 (1995). The prejudice the Appellant must show is by less than a preponderance of the evidence because "[t] he reasonable-probability standard is not the same as, and should not be confused with, a requirement that the Appellant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 9 (2004). In assessing prejudice, this Court is obligated to consider the cumulative effect of the multiplicity of counsel's errors demonstrated in the record below. *Strickland v. Washington*, 466 U.S. 668, 690 (1984).

Ms. Richards contends that there is reasonable probability that if trial counsel obtained Ms. Chavira as witness, the result of the proceedings would have been different. *Id*. For, trial counsel states in his own motion that Ms. Chavira's testimony "clearly shows that she [Mrs. Lardieri] was Ms. Huth's most violent assailant…and although Ms. Lardieri and Ms. Huff state that the Defendant cut Ms. Huff's neck, Mrs. Chavira unequivocally states that Ms. Lardieri told her that she did, and that inconsistency is clearly

exculpatory, mitigating, and/or impeaching for the Defendant. (Appellate Cause Number 03-15-00247-CR 5 RR 73). Without Ms. Chavira's testimony, Ms. Richards was portrayed as the main aggressor, and this influenced the jurors in there rendering of guilt and punishment. (Appellate Cause Number 03-15-00247-CR 5 RR 73-76).

Next, Ms. Richards contends that her trial counsel was deficient in that he did not discuss with her that he filed the punishment election for the jury to assess her punishment if found guilty. (1 CR 274). Ms. Richards' punishment election for the jury to assess punishment does not contain her signature. (1 CR 274). In Mr. Olson's affidavit he states that at some point he discussed probation eligibility with Ms. Richards at the jail, and that Ms. Richards commented on a codefendant going to the Court for punishment; however, trial counsel refuses to address whether Ms. Richards ultimately was informed of or involved in the punishment selection ultimately made. (1 CR 265-266).

Mr. Olson attempts in his affidavit to suggest that Ms. Richards made the decision to elect the jury for punishment so that she could receive probation. (1 CR 265-266). However, this is counterintuitive, as trial counsel did not verify the application for probation before trial commenced

36

and did not have a method of proving probation eligibility to the jury, and these issues would have been addressed if Ms. Richards was ultimately involved in making the punishment election for the jury. (11 RR 5, 74).

Correspondingly, Ms. Richards contends that trial counsel was ineffective in that he did not have a means to prove to the jury that Ms. Richards was probation eligible. (11 RR 74). Trial counsel states on the record regarding this, "No. I have nothing, Chari, That's why it is—that's why I'm dead," and "this has just been one mistake after another, one thing after another." (11 RR 74, 75). After much discussion, the State and the trial court, without any suggestion from the defense, came up with the solution to just have the application for probation be admitted into evidence. (11 RR 74-82). Trial counsel then needed to be reminded by the trial court to publish the document to the jury, after trial counsel had already made his closing statements, which failed to make any mention that Ms. Richards was eligible for probation. (11 RR 105). Ms. Richards contends that there is no better evidence of ineffective assistance of counsel then when the trial court and the State act on their own on behalf of a defendant without assistance from defense counsel, as occurred in this case. (11 RR 74-82, 105).

There is a reasonable probability that the result of the punishment would have been different if Ms. Richards had elected for the Court to assess her punishment, as the trial court had previously granted Ms. Lardieri 30 years in the Texas Department of Criminal Justice, Institutional Division. *Strickland v. Washington*, 466 U.S. 668, 690 (1984); (1 CR 341). The record reflects that Ms. Richards' conduct and actions the night of the offense was either less culpable, or at the very least equal to Ms. Lardieri's; therefore, it is reasonable that the same trial court would have granted Ms. Richards the same sentence as Ms. Lardieri, if not a similar sentence. (1 CR 341). There is also a reasonable probability that the jury may have granted Ms. Richards probation if trial counsel had a manner to prove Ms. Richards' eligibility and at the very least mentioned this eligibility to the jury during punishment argument. (11 RR 105).

Lastly, it is important to note for the Court's consideration of Appellant's contention that she was not provided effective assistance of counsel, that trial counsel could not find his materials multiple times throughout the course of the trial. (8 RR 21); (8 RR 32-36); (11 RR 70). There is absolutely no plausible trial strategy behind the Appellant's trial counsel not having the file of the case and copies of key evidence at trial,

and Appellant asks the Court to take this into consideration when conducting the *Strickland* analysis.  *Id*.

**Point of Error Three**

**Rule**

Hearsay statements must fall within a recognized exception to be admissible.  TEX R. EVID 802.  An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition" and is such an exception to the hearsay rule.  TEX. R. EVID. 803(2).  Under *McCarty v. State*, there are three factors to be applied when determining if a statement falls under this exception: (1) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; (2) the resulting statement should be sufficiently "related to" the startling event to ensure the reliability and trustworthiness of that statement, and (3) the "exciting event" should be startling enough to evoke a truly spontaneous reaction from the declarant.  *McCarty v. State*, 257 S.W.3 238, 241 (Tex. Crim. App. 2008).

A trial court's decision to admit evidence is reviewed under an abuse of discretion standard.  *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006).  A violation of an evidentiary rule that results in the erroneous

admission of evidence constitutes nonconstitutional error under TEX.R.APP. P. 44.2(b), and a reviewing court should reverse if the error affected an Appellant's substantial rights. *Barshaw v. Sate*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). An error affects a substantial right when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Furthermore, a criminal conviction will be reversed for a nonconstitutional error if, after examining the record, an Appellate Court determines that the error did influence the jury, opposed to having a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

**Analysis**

It was error for the Trial Court to admit State's Exhibit 70, inadmissible hearsay. (6 RR 171). State's Exhibit 70, is an over fifteen minute audio recording taken by Detective De Leon of the alleged victim at the hospital, when the alleged victim is receiving medical treatment. (6 RR 171).

The Appellant contends that the application of the first *McCarty* factor, the reaction to the startling event should be quick enough to avoid the

40

possibility of fabrication, weighs in favor of Appellant's argument that the audio recording should not have been admitted. *Id.* The Appellant escaped the shed where she was left by the defendants, and found shelter inside of a neighbor's vehicle at around 3 p.m. the morning after the alleged offense. (6 RR 65). State's Exhibit 70 was taken at 8:46 a.m. the morning after the alleged offense. (STATE'S EXHIBIT 70). Therefore, the recording in question was taken almost six hours after the alleged victim escaped from the startling event. (6 RR 65).

The State will likely argue that the alleged victim was still under the stress of the starling event when she was discovered in the neighbor's vehicle. However, the record reflects that at 6:00 a.m., the owner of the vehicle's husband came outside to go to work, and Ms. Huth did not alert him to the fact she was inside of his wife's vehicle, because she "did not want him to miss work." (6 RR 68). The record further reflects that Ms. Huth also did not alert the neighbor the first time she appeared outside on her porch, but the second time the neighbor came outside. (6 RR 69). Additionally, Ms. Huth begged the neighbor to not contact law enforcement, but to contact her friend Clint Barkley. (6 RR 69). These calculated actions on the part of Ms. Huth demonstrate that she was still not under the stress of the event during this time frame. (6 RR 68-69).

41

The State will most likely contend that Ms. Huth was still in pain and under the excitement of the event when State's Exhibit 70 was recorded, however, Ms. Huth was calm enough and presumably not under excruciating pain when Ms. Huth intentionally did not alert the neighbors twice when they appeared outside of their home, and this was several hours prior to the recording in question. (6 RR 68-69). Ms. Huth was also composed enough several hours before State's Exhibit 70 was recorded, when she begged the neighbor who discovered her to not contact law enforcement but to contact her friend. (6 RR 68-69). Ms. Richards contends that Ms. Huth's actions demonstrate that the time interval between the startling event and the time when State's Exhibit 70 was recorded was long enough to permit reflective thought on Ms. Huth's behalf, and therefore Sate's Exhibit 70 should have not been admitted. *Apolinar v. State*, 155 S.W.3d 184, 186-187 (Tex. Crim. App. 2005); (6 RR 69).

The Appellant also asserts that the second *McCarty* factor, that the resulting statement should be sufficiently "related to" the startling event to ensure the reliability and trustworthiness of that statement also weighs heavily in favor of the Appellant's argument. *Id*. The only information on the recording "related to" the offense or the startling event, is Ms. Huth naming Ms. Richards and the codefendants as her assailants." (STATE'S

EXHIBIT 70). At minute 4:45 into State's Exhibit 70, the Detective informs Ms. Huth that law enforcement is "taking off," however the recording continues for approximately another eleven minutes. (STATE'S EXHIBT 70). During this period of eleven minutes, Ms. Huth is undergoing medical treatment, and is screaming, groaning, and crying hysterically in pain. (STATE'S EXHIBIT 70). The Court attempts to give a curing instruction regarding hearsay statements in the background regarding medical treatment of the alleged victim, however this does not remove the taint of the jury listening to eleven minutes of Ms. Huth's anguish. (6 RR 179).

The Appellant concedes that the third *McCarty* factor, that the "exciting event" should be startling enough to evoke a truly spontaneous reaction from the declarant, is favorable for the State. However, the first two *McCarty* factors weigh heavily in favor of State's Exhibit Number 70 not falling under the excited utterance exception, and therefore, State's Exhibit Number 70 should not have been admitted into evidence. *Id*.

Ms. Richards asks the Court to reverse the conviction below, because the error in admitting State's Exhibit 70 affected Ms. Richard's substantial rights, in that the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.

43

Crim. App. 1997). For, It cannot reasonably be argued that after a jury listened to State's Exhibit 70, and heard firsthand the great anguish that Ms. Huth was in at the hospital, that the jury did not consider such in convicting Ms. Richards. *Id*. The State even emphasized such in closing statements, arguing to the jury, "You heard Dana's voice on a hospital tape." (10 RR 71).

**Point of Error Four**

**Rule**

Under The Texas Rules of Evidence, Article 402, "irrelevant evidence is not admissible." TEX. R. EVID. 402. Further, under The Texas Rules of Evidence, Article 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. The Texas Court of Criminal Appeals under the "*Montgomery* Factors" requires reviewing courts to analyze and balance "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; [and] (4) the

44

proponent's need for the evidence. *Montgomery v. State,* 810 S.W.2d 372 (Tex. Crim. App. 1990).

A trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *Wall v. State,* 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). A violation of an evidentiary rule that results in the erroneous admission of evidence constitutes nonconstitutional error under TEX.R.APP. P. 44.2(b), and a reviewing court should reverse if the error affected an Appellant's substantial rights. *Barshaw v. Sate,* 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). An error affects a substantial right when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Furthermore, a criminal conviction will be reversed for a nonconstitutional error if, after examining the record, an Appellate Court determines that the error did influence the jury, opposed to having a slight effect. *Motilla v. State,* 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

**Analysis**

During the punishment phase below, trial counsel objected to the admission of certain photographs, and argued that the probative value of the photographs was outweighed by the prejudicial effect. TEX. R. EVID. 403.

Appellant first would contend that these photographs were not relevant under Texas Rules of Evidence Article 402, as there was no nexus between the photographs and Ms. Richards, because the Photographs in questions were taken five days after Ms. Richards' arrest, when she was no longer residing at the home where the photographs were taken (10 RR 90).

However, if the Court were to hold that the photographs were relevant, then Ms. Richards would ask the Court to hold that the probative value of the photographs was outweighed by their prejudicial effect, and it was error for State's Exhibit 289, 291, 294, 295, 296, and 298 to be admitted into evidence. TEX. R. EVID. 403. State's Exhibit 289 depicts a baby pacifier laying on top of bullets; State's Exhibit 291 depicts a rifle with the confederate flag in the background; State's Exhibit 294 depicts a baby bassinet next to an open chest that contains pornography and a gun; State's Exhibit 295 is a close up of State's Exhibit 294; State's Exhibit 296 depicts another gun and a rifle cleaning kit; and State's Exhibit 298 depicts multiple shotguns right next to a different baby bassinet. (10 RR 87).

The first *Montgomery* factor, the probative value of the evidence, weighs heavily in Ms. Richards' favor, as Appellant asserts that there was absolutely no probative value contained in the photographs admitted before the jury. *Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1990). The

46

Photographs in questions were taken five days after Ms. Richards' arrest, when Ms. Richards was no longer residing at the home, and only her boyfriend, Mr. Nealon, was. (10 RR 90). The record is void of any evidence that anything depicted in the photographs actually belonged to Ms. Richards. Moreover, the record reflects that at the time of trial, Mr. Nealon was serving time in a federal penitentiary; therefore Ms. Richards contends that the photographs admitted before the jury was probative only with regard to Mr. Nealon. (6 RR 126). Moreover, the photographs admitted have no connection to the instant offense, as there was no gun used by Ms. Richards, and none of the photographed guns were identified by Ms. Huth as the gun used by Mr. Smith. (10 RR 87).

The Second *Montgomery* Factor, the potential to impress the jury in some irrational, yet indelible way, also weighs heavily in favor of the photographs being suppressed. *Id*. Ms. Richards contends that these photographs were offered by the State for the sole purpose of inflaming the passions of the jury and to paint the picture that Ms. Richards was a violent and racist sexual deviant, and more importantly a terrible mother. (STATE'S EXHIBIT 289, 291, 294, 295, 296, and 298). The photographs admitted were the bulk of the State's punishment case, and are quite disturbing in many different aspects. (STATE'S EXHIBIT 289, 291, 294,

295, 296, and 298). Many jurors could have been very offended that Ms. Richards had the confederate flag hanging in her home, or that there were so many guns in such close proximity to where infant children were presumably sleeping, or that there was pornography right next to where infant children were presumably sleeping, and used this against Ms. Richards in assessing her punishment. (STATE'S EXHIBIT 289, 291, 294, 295, 296, and 298). For example, when viewing State's Exhibit 289, the photograph depicting a pacifier laying on top of bullets, the only thing that this image conjures is an irrational, yet unforgettable feeling of aversion. (STATE'S EXHIBIT 289). The State highlighted the injurious effect of the photographs in question in their closing statements,

"What did we learn about that one woman in punishment? We learned that she keeps firearms all over her home, next to baby bassinets, and alcohol. We learned that she has—well, actually that brings me to something. Where was Heather Richards, the devoted family woman—or where were her children as all of this was going on? Where were her infant babies? When she went off and she was angry, where were they? Was she thinking about them when she left them in that house? The devoted mother who leaves her house that way." (11 RR 106-107).

The third *Montgomery* factor, the time needed to develop the evidence, also weighs in favor of Ms. Richards' argument that the photographs should not have been admitted, as the admission of photographs was the bulk of the State's punishment case, and was highlighted in the State's closing

48

statements. (10 RR 103-117); (11 RR 106-107). The record reflects that the State's punishment case consists of approximately 16 pages, 14 pages of which involve the photographs in question. (10 RR 103-117)

The last *Montgomery* factor, the proponent's need for the evidence, further bolsters Ms. Richards' contentions that the photographs should not have been admitted, as we are not dealing with autopsy photographs, or the like, but photographs of a residence that Ms. Richards was removed from five days earlier and have no connection to the crimes for which Ms. Richards was found guilty. *Id.* As articulated by the Court of Criminal Appeals in *Erazo v. State*, "The relevance value of a photograph is to show appearance…A crime-scene photograph or an autopsy photograph is not admissible simple to show the death of the individual. These photographs are admissible despite the fact, and because, they show more than the testimony. But, that "something more" must be relevant and helpful to the jury." *Erazo v. State*, 144 S.W.3d 487, 493 (Tex. Crim. App. 2004).

Ms. Richards would ask the Court to reverse and remand the case on the issue of punishment, as the error in admitting these photographs had a substantial and injurious effect or influence in determining the jury's punishment verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Again, the photographs admitted were the bulk of the State's

punishment case, relied upon heavily by the State in closing, and are disconcerting in many different aspects. (10 RR 103-117); (11 RR 106-107).

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Heather Lauren Richards, prays this Honorable Court will reverse the judgment below, or in the alternative remand the case on the issue of punishment.

Respectfully Submitted,

_/s/ Amanda Erwin_____
Amanda Erwin
The Erwin Law Firm, L.L.P.
109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804
Amanda@TheErwinLawFirm.com
Attorney for Appellant
Heather Lauren Richards

**CERTIFICATE OF SERVICE**

Pursuant to TEX. R. APP. P. 9.5, I certify that of December 9, 2015, a copy of this motion was electronically served, to the following:

Mr. Joshua Presley
Chief Appellate Prosecutor
Comal County Criminal District Attorney's Office
150 N. Seguin, Suite 307
New Braunfels, Texas 78130
Preslj@co.comal.tx.us


_/s/_Amanda Erwin_____
Amanda Erwin

**CERTIFICATE OF COMPLIANCE STATING NUMBER OF WORDS IN BRIEF**

Pursuant to Tex. R. App. P. 9.4(i), Appellee certifies that this Appellate Brief contains only 11,826 words, and is therefore compliant with the maximum word limitation allowed but the Honorable Court.

/s/ Amanda Erwin

_____

Amanda Erwin